## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE UNDERWRITING MEMBERS OF LLOYD'S SYNDICATES 2, 53, 55, 205, 228, 271, 376, 510, 529, 535, 557, 588, 672, 807, 861, 991, 1003, 1121, 1209, 1236, 1243, 1308, 2003, AND 2020; MARLON INSURANCE COMPANY LIMITED; THE COPENHAGEN REINSURANCE COMPANY (U.K.) LIMITED; UNIONAMERICA INSURANCE COMPANY LIMITED; SCOR GLOBAL P&C SE; SCOR UK COMPANY LIMITED; SCOR REINSURANCE ASIA-PACIFIC PTE LIMITED; SCOR REINSURANCE COMPANY (ASIA) LIMITED; SCOR REINSURANCE COMPANY; GENERAL SECURITY NATIONAL INSURANCE COMPANY; GENERAL SECURITY INDEMNITY COMPANY OF ARIZONA; SCOR CANADA REINSURANCE COMPANY; LIBERTY MUTUAL INSURANCE COMPANY; AMERICAN ECONOMY INSURANCE COMPANY; AMERICAN FIRE AND CASUALTY COMPANY; EMPLOYERS INSURANCE COMPANY OF WAUSAU; EXCELSIOR INSURANCE COMPANY; THE FIRST LIBERTY INSURANCE CORPORATION; GENERAL INSURANCE COMPANY OF AMERICA; INDIANA INSURANCE COMPANY; LIBERTY INSURANCE CORPORATION; LIBERTY INSURANCE UNDERWRITERS, INC.; LIBERTY LIFE ASSURANCE COMPANY OF BOSTON; LIBERTY LLOYDS OF TEXAS INSURANCE COMPANY; LIBERTY MUTUAL FIRE INSURANCE COMPANY; LM INSURANCE CORPORATION; LM PROPERTY AND CASUALTY INSURANCE COMPANY; LIBERTY MANAGING AGENCY LIMITED FOR AND ON BEHALF OF THE LLOYD'S UNDERWRITING MEMBERS FROM | CIVIL ACTION NO.: 1:16-CV-07853; 03 MDL 1570 (GBD) (SN)

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED** |

| | |
|---|---|
| TIME TO TIME OF LLOYD'S SYNDICATES 4472, 190 AND 282; LIBERTY MUTUAL INSURANCE EUROPE LIMITED; THE MIDWESTERN INDEMNITY COMPANY; THE NETHERLANDS INSURANCE COMPANY; THE OHIO CASUALTY INSURANCE COMPANY; PEERLESS INSURANCE COMPANY; SAFECO INSURANCE COMPANY OF AMERICA; WAUSAU BUSINESS INSURANCE COMPANY; WAUSAU UNDERWRITERS INSURANCE COMPANY; WEST AMERICAN INSURANCE COMPANY; AMERICAN SAFETY INDEMNITY COMPANY; AMERICAN SAFETY CASUALTY INSURANCE COMPANY; ODYSSEY REINSURANCE COMPANY; AND QBE INSURANCE (INTERNATIONAL) LTD.<br><br>Plaintiffs,<br><br>   v.<br><br>AL RAJHI BANK, NATIONAL COMMERCIAL BANK, AND SAUDI BINLADIN GROUP<br><br>Defendants. | |

## THE PARTIES

1. Plaintiff, Underwriting Members of Lloyd's Syndicate 2, is a United Kingdom based insurance syndicate.  At all times relevant hereto, Syndicate 2 was engaged in the business of insurance.

2. Plaintiff, Underwriting Members of Lloyd's Syndicate 53, is a United Kingdom based insurance syndicate.  At all times relevant hereto, Syndicate 53 was engaged in the business of insurance.

3.      Plaintiff, Underwriting Members of Lloyd's Syndicate 55, is a United Kingdom based insurance syndicate.  At all times relevant hereto, Syndicate 55 was engaged in the business of insurance.

4.      Plaintiff, Underwriting Members of Lloyd's Syndicate 205, is a United Kingdom based insurance syndicate.  At all times relevant hereto, Syndicate 205 was engaged in the business of insurance.

5.      Plaintiff, Underwriting Members of Lloyd's Syndicate 228, is a United Kingdom based insurance syndicate.  At all times relevant hereto, Syndicate 228 was engaged in the business of insurance.

6.      Plaintiff, Underwriting Members of Lloyd's Syndicate 271, is a United Kingdom based insurance syndicate.  At all times relevant hereto, Syndicate 271 was engaged in the business of insurance.

7.      Plaintiff, Underwriting Members of Lloyd's Syndicate 376, is a United Kingdom based insurance syndicate.  At all times relevant hereto, Syndicate 376 was engaged in the business of insurance.

8.      Plaintiff, Underwriting Members of Lloyd's Syndicate 510, is a United Kingdom based insurance syndicate.  At all times relevant hereto, Syndicate 510 was engaged in the business of insurance.

9.      Plaintiff, Underwriting Members of Lloyd's Syndicate 529, is a United Kingdom based insurance syndicate.  At all times relevant hereto, Syndicate 529 was engaged in the business of insurance.

10.    Plaintiff, Underwriting Members of Lloyd's Syndicate 535, is a United Kingdom based insurance syndicate.  At all times relevant hereto, Syndicate 535 was engaged in the business of insurance.

11.    Plaintiff, Underwriting Members of Lloyd's Syndicate 557, is a United Kingdom based insurance syndicate.  At all times relevant hereto, Syndicate 557 was engaged in the business of insurance.

12.    Plaintiff, Underwriting Members of Lloyd's Syndicate 588, is a United Kingdom based insurance syndicate.  At all times relevant hereto, Syndicate 588 was engaged in the business of issuing policies of insurance.

13.    Plaintiff, Underwriting Members of Lloyd's Syndicate 672, is a United Kingdom based insurance syndicate.  At all times relevant hereto, Syndicate 672 was engaged in the business of issuing policies of insurance.

14.    Plaintiff, Underwriting Members of Lloyd's Syndicate 807, is a United Kingdom based insurance syndicate.  At all times relevant hereto, Syndicate 807 was engaged in the business of insurance.

15.    Plaintiff, Underwriting Members of Lloyd's Syndicate 861, is a United Kingdom based insurance syndicate.  At all times relevant hereto, Syndicate 861 was engaged in the business of issuing policies of insurance.

16.    Plaintiff, Underwriting Members of Lloyd's Syndicate 991, is a United Kingdom based insurance syndicate.  At all times relevant hereto, Syndicate 991 was engaged in the business of insurance.

17.    Plaintiff, Underwriting Members of Lloyd's Syndicate 1003, is a United Kingdom based insurance syndicate.    At all times relevant hereto, Syndicate 1003 was engaged in the business of insurance.

18.    Plaintiff, Underwriting Members of Lloyd's Syndicate 1121, is a United Kingdom based insurance syndicate.    At all times relevant hereto, Syndicate 1121 was engaged in the business of insurance.

19.    Plaintiff, Underwriting Members of Lloyd's Syndicate 1209, is a United Kingdom based insurance syndicate.    At all times relevant hereto, Syndicate 1209 was engaged in the business of issuing policies of insurance.

20.    Plaintiff, Underwriting Members of Lloyd's Syndicate 1236, is a United Kingdom based insurance syndicate.    At all times relevant hereto, Syndicate 1236 was engaged in the business of insurance.

21.    Plaintiff, Underwriting Members of Lloyd's Syndicate 1243, is a United Kingdom based insurance syndicate.    At all times relevant hereto, Syndicate 1243 was engaged in the business of insurance.

22.    Plaintiff, Underwriting Members of Lloyd's Syndicate 1308, is a United Kingdom based insurance syndicate.    At all times relevant hereto, Syndicate 1308 was engaged in the business of insurance.

23.    Plaintiff, Underwriting Members of Lloyd's Syndicate 2003, is a United Kingdom based insurance syndicate.    At all times relevant hereto, Syndicate 2003 was engaged in the business of insurance.

24.     Plaintiff, Underwriting Members of Lloyd's Syndicate 2020, is a United Kingdom based insurance syndicate.  At all times relevant hereto, Syndicate 2020 was engaged in the business of insurance.

25.     Plaintiff, Marlon Insurance Company Limited ("Marlon Insurance"), is a corporation organized and existing under the laws of the United Kingdom, with a principal place of business located at Avaya House, 2 Cathedral Hill, Guildford, Surrey GU2 7YL, England. Pursuant to a cross-border merger in 2013, Marlon Insurance is the legal successor in interest to the business of The Copenhagen Reinsurance Company Limited ("Copenhagen Re Denmark"), a Danish company.  At all times relevant hereto, Copenhagen Re Denmark was engaged in the business of insurance.

26.     Plaintiff, The Copenhagen Reinsurance Company (U.K.) Limited ("Copenhagen Re UK"), is a corporation organized and existing under the laws of United Kingdom, with a principal place of business located at Avaya House, 2 Cathedral Hill, Guildford, Surrey GU2 7YL, England.  At all times relevant hereto, Copenhagen Re UK was engaged in the business of insurance.

27.     Plaintiff, Unionamerica Insurance Company Limited ("Unionamerica Insurance"), is a corporation organized and existing under the laws of the United Kingdom, with a principal place of business located at Avaya House, 2 Cathedral Hill, Guildford, Surrey GU2 7YL, England. Pursuant to a statutory business transfer in 2007, Unionamerica Insurance is the legal successor in interest to the business of St. Paul Reinsurance Company Limited ("St. Paul Re").  At all times relevant hereto, St. Paul Re was engaged in the business of insurance.

28.     Plaintiff, SCOR Global P&C SE ("SCOR"), on behalf of its affiliates and branches, including without limitation, SCOR Global P&C SE Deutschland and SCOR Global P&C SE UK,

is a corporation organized and existing under the laws of France, with a principal place of business located at 5, Avenue Kleber, Paris, 75795, 16 Cedex, France.  At all times relevant hereto, SCOR was engaged in the business of insurance.

29.    Plaintiff, SCOR UK Company Limited ("SCOR UK"), is a corporation organized and existing under the laws of the United Kingdom, with a principal place of business located at 10 Lime Street, London EC3M 7AA, United Kingdom.  At all times relevant hereto, SCOR UK was engaged in the business of insurance.

30.    Plaintiff, SCOR Reinsurance Asia-Pacific Pte Limited ("SCOR Asia-Pacific"), is a corporation organized and existing under the laws of Singapore, with a principal place of business located at 12 Marina View, #25-03, Asia Square Tower 2, Singapore.  At all times relevant hereto, SCOR Asia-Pacific was engaged in the business of insurance.

31.    Plaintiff, SCOR Reinsurance Company (Asia) Limited ("SCOR Reinsurance Asia"), is a corporation organized and existing under the laws of Hong Kong, with a principal place of business located at 3201-10 Shui On Centre, 6-8 Harbour Road, Wanchai, Hong Kong. At all times relevant hereto, SCOR Reinsurance Asia was engaged in the business of insurance.

32.    Plaintiff, SCOR Reinsurance Company ("SCOR Reinsurance"), is a corporation organized and existing under the laws of the State of New York, with a principal place of business located at One Seaport Plaza, 199 Water Street, Suite 2100, New York, New York.  At all times relevant hereto, SCOR Reinsurance was engaged in the business of insurance.

33.    Plaintiff, General Security National Insurance Company ("General Security National Insurance"), is a corporation organized and existing under the laws of the State of New York, with a principal place of business located at One Seaport Plaza, 199 Water Street, Suite

2100, New York, New York.  At all times relevant hereto, General Security National Insurance was engaged in the business of insurance.

34.     Plaintiff, General Security Indemnity Company of Arizona ("General Security Indemnity"), is a corporation organized and existing under the laws of the State of Arizona, with a principal place of business located at One Seaport Plaza, 199 Water Street, Suite 2100, New York, New York.  At all times relevant hereto, General Security Indemnity was engaged in the business of insurance.

35.     Plaintiff, SCOR Canada Reinsurance Company ("SCOR Canada"), is a corporation organized and existing under the laws of Canada, with a principal place of business located at Commerce Court West, 199 Bay Street, Toronto, Ontario M5L 1G1.  At all times relevant hereto, SCOR Canada was engaged in the business of insurance.

36.     Plaintiff, Liberty Mutual Insurance Company ("Liberty Mutual"), is a corporation organized and existing under the laws of the Commonwealth of Massachusetts, with a principal place of business located at 175 Berkeley Street, Boston, Massachusetts.  At all times relevant hereto, Liberty Mutual was engaged in the business of insurance and reinsurance.

37.     Plaintiff, American Economy Insurance Company ("American Economy"), is a corporation organized and existing under the laws of the State of Indiana, with a principal place of business located at 175 Berkeley Street, Boston, Massachusetts.  At all times relevant hereto, American Economy was engaged in the business of insurance.

38.     Plaintiff, American Fire and Casualty Company ("American Fire and Casualty"), is a corporation organized and existing under the laws of the State of New Hampshire, with a principal place of business located at 175 Berkeley Street, Boston, Massachusetts.  At all times relevant hereto, American Fire and Casualty was engaged in the business of insurance.

39.     Plaintiff, Employers Insurance Company of Wausau ("Employers Insurance"), is a corporation organized and existing under the laws of the State of Wisconsin, with a principal place of business located at 175 Berkeley Street, Boston, Massachusetts.  At all times relevant hereto, Employers Insurance was engaged in the business of insurance.

40.     Plaintiff, Excelsior Insurance Company ("Excelsior Insurance"), is a corporation organized and existing under the laws of the State of New Hampshire, with a principal place of business located at 175 Berkeley Street, Boston, Massachusetts.  At all times relevant hereto, Excelsior Insurance was engaged in the business of insurance.

41.     Plaintiff, The First Liberty Insurance Corporation ("First Liberty"), is a corporation organized and existing under the laws of the State of Illinois, with a principal place of business located at 175 Berkeley Street, Boston, Massachusetts.  At all times relevant hereto, First Liberty was engaged in the business of insurance.

42.     Plaintiff, General Insurance Company of America ("General Insurance Company"), is a corporation organized and existing under the laws of the State of New Hampshire, with a principal place of business located at 175 Berkeley Street, Boston, Massachusetts.  At all times relevant hereto, General Insurance Company was engaged in the business of insurance.

43.     Plaintiff, Indiana Insurance Company ("Indiana Insurance"), is a corporation organized and existing under the laws of the State of Indiana, with a principal place of business located at 175 Berkeley Street, Boston, Massachusetts.  At all times relevant hereto, Indiana Insurance was engaged in the business of insurance.

44.     Plaintiff, Liberty Insurance Corporation ("Liberty Insurance"), is a corporation organized and existing under the laws of the State of Illinois, with a principal place of business

located at 175 Berkeley Street, Boston, Massachusetts. At all times relevant hereto, Liberty Insurance was engaged in the business of insurance.

45.    Plaintiff, Liberty Insurance Underwriters Inc. ("Liberty Insurance Underwriters"), is a corporation organized and existing under the laws of the State of Illinois, with a principal place of business located at 175 Berkeley Street, Boston, Massachusetts. At all times relevant hereto, Liberty Insurance Underwriters was engaged in the business of insurance.

46.    Plaintiff, Liberty Life Assurance Company of Boston ("Liberty Life Assurance"), is a corporation organized and existing under the laws of the State of New Hampshire, with a principal place of business located at 175 Berkeley Street, Boston, Massachusetts. At all times relevant hereto, Liberty Life Assurance was engaged in the business of insurance.

47.    Plaintiff, Liberty Lloyds of Texas Insurance Company ("Liberty Lloyds of Texas"), is a corporation organized and existing under the laws of the State of Texas, with a principal place of business located at 175 Berkeley Street, Boston, Massachusetts. At all times relevant hereto, Liberty Lloyds of Texas was engaged in the business of insurance.

48.    Plaintiff, Liberty Mutual Fire Insurance Company ("Liberty Mutual Fire"), is a corporation organized and existing under the laws of the State of Wisconsin, with a principal place of business located at 175 Berkeley Street, Boston, Massachusetts. At all times relevant hereto, Liberty Mutual Fire was engaged in the business of insurance.

49.    Plaintiff, LM Insurance Corporation ("LM Insurance"), is a corporation organized and existing under the laws of the State of Illinois, with a principal place of business located at 175 Berkeley Street, Boston, Massachusetts. At all times relevant hereto, LM Insurance was engaged in the business of insurance.

50.     Plaintiff, LM Property and Casualty Insurance Company ("LM Property and Casualty"), is a corporation organized and existing under the laws of the State of Indiana, with a principal place of business located at 175 Berkeley Street, Boston, Massachusetts.  At all times relevant hereto, LM Property and Casualty was engaged in the business of insurance.

51.     Plaintiff, Liberty Managing Agency Limited, formerly known as Liberty Syndicate Management LLC, ("Liberty Managing Agency"), for and on behalf of the Lloyd's Underwriting Members from time to time of Lloyd's Syndicates 4472, 190 and 282, is a corporation organized and existing under the laws of England, with a registered address of 20 Fenchurch Street, London EC3M 3AW, United Kingdom.  At all times relevant hereto, Liberty Managing Agency was engaged in the business of insurance and emtering into contracts of reinsurance for and on behalf of Lloyd's Syndicates 4472, 190, and 282.

52.     Plaintiff, Liberty Mutual Insurance Europe Limited ("Liberty Mutual Insurance Europe"), is a corporation organized and existing under the laws of the United Kingdom, with a registered address of 20 Fenchurch Street, London EC3M 3AW, United Kingdom.  At all times relevant hereto, Liberty Mutual Insurance Europe was engaged in the business of insurance and reinsurance.

53.     Plaintiff, The Midwestern Indemnity Company ("Midwestern Indemnity"), is a corporation organized and existing under the laws of the State of New Hampshire, with a principal place of business located at 175 Berkeley Street, Boston, Massachusetts.  At all times relevant hereto, Midwestern Indemnity was engaged in the business of insurance.

54.     Plaintiff, The Netherlands Insurance Company ("Netherlands Insurance"), is a corporation organized and existing under the laws of the State of New Hampshire, with a principal

place of business located at 175 Berkeley Street, Boston, Massachusetts.  At all times relevant hereto, Netherlands Insurance was engaged in the business of insurance.

55.    Plaintiff, The Ohio Casualty Insurance Company ("Ohio Casualty Insurance"), is a corporation organized and existing under the laws of the State of New Hampshire, with a principal place of business located at 175 Berkeley Street, Boston, Massachusetts.  At all times relevant hereto, Ohio Casualty Insurance was engaged in the business insurance.

56.    Plaintiff, Peerless Insurance Company ("Peerless Insurance"), is a corporation organized and existing under the laws of New Hampshire, with a principal place of business located at 175 Berkeley Street, Boston, Massachusetts.  At all times relevant hereto, Peerless Insurance was engaged in the business of insurance.

57.    Plaintiff, Safeco Insurance Company of America ("Safeco Insurance"), is a corporation organized and existing under the laws of the State of New Hampshire, with a principal place of business located at 175 Berkeley Street, Boston, Massachusetts.  At all times relevant hereto, Safeco Insurance was engaged in the business of insurance.

58.    Plaintiff, Wausau Business Insurance Company ("Wausau Business"), is a corporation organized and existing under the laws of the State of Wisconsin, with a principal place of business located at 175 Berkeley Street, Boston, Massachusetts.  At all times relevant hereto, Wausau Business was engaged in the business of insurance.

59.    Plaintiff, Wausau Underwriters Insurance Company ("Wausau Underwriters"), is a corporation organized and existing under the laws of the State of Wisconsin, with a principal place of business located at 175 Berkeley Street, Boston, Massachusetts.  At all times relevant hereto, Wausau Underwriters was engaged in the business of insurance.

60.     Plaintiff, West American Insurance Company ("West American"), is a corporation organized and existing under the laws of the State of Indiana, with a principal place of business located at 175 Berkeley Street, Boston, Massachusetts.  At all times relevant hereto, West American was engaged in the business of insurance.

61.     Plaintiff, American Safety Indemnity Company ("American Safety"), is a corporation organized and existing under the laws of the State of Oklahoma, with a principal place of business located at 250 Commercial Street, Manchester, New Hampshire.  At all times relevant hereto, American Safety was engaged in the business of insurance.

62.     Plaintiff, American Safety Casualty Insurance Company ("American Safety Casualty"), is a corporation organized and existing under the laws of the State of Oklahoma, with a principal place of business located at 250 Commercial Street, Manchester, New Hampshire.  At all times relevant hereto, American Safety Casualty was engaged in the business of insurance.

63.     Plaintiff Odyssey Reinsurance Company ("Odyssey Re"), is a corporation organized and existing under the laws of the United Kingdom, with a principal place of business located at 3 Minster Court, Suite 5/4, Mincing Lane, EC3R 7DD, London, England.  At all times relevant hereto, Odyssey Re was engaged in the business of insurance.

64.     Plaintiff, QBE Insurance (International) Ltd. ("QBE"), is a corporation organized and existing under the laws of the State of New York, with a principal place of business located at Wall Street Plaza, 88 Pine Street, New York, New York.  At all times relevant hereto, QBE was engaged in the business of insurance.

65.     At all times relevant hereto, Plaintiffs were engaged in the business of insurance and/or reinsurance.  Pursuant to applicable policies of insurance and/or contracts of reinsurance, Plaintiffs and/or their predecessors in interest made payments in compensation for injuries suffered

by nationals of the United States to their persons, properties and businesses by reason of the September 11, 2001 attacks, including payments in compensation for the physical destruction of the World Trade Center and other buildings, structures, or property, and are thereby subrogated to the rights of recovery of those nationals of the United States.  In total, Plaintiffs' payments in compensation for losses resulting from the September 11th attacks approach $4 billion.

66.     The losses Plaintiffs seek to recover through this action have not been the subject of a prior claim against these defendants.

67.     Defendant Al Rajhi Bank ("Al Rajhi Bank"), formerly known as al Rajhi Banking and Investment Company, is a Saudi-based international financial institution, with a principal place of business located at Olaya Street, Riyadh, Saudi Arabia.  Al Rajhi Bank maintains operations throughout the world, providing a broad range of financial services, including Shariah compliant finance products and services, to individual and institutional clients.

68.     Defendant National Commercial Bank ("NCB") is a Saudi-based international financial institution, with a principal place of business located at King Abdul Aziz Street, Jeddah, Saudi Arabia.  NCB maintains operations throughout the world, providing a broad range of financial services, including Shariah compliant finance products and services, to individual and institutional clients.

69.     Defendant Saudi Binladin Group ("SBG") is a Saudi-based construction conglomerate founded by Osama bin Laden's father and controlled to this day by the bin Laden family, with a principal place of business located in Jeddah, Saudi Arabia.

## I.    <u>JURISDICTION</u>

70.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 (federal question).

71.    Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to the claims asserted herein occurred in this district.

## II.    <u>NATURE OF THE ACTION</u>

72.    This is a suit for recovery of damages suffered by nationals of the United States by reason of the September 11, 2001 terrorist attacks upon the United States.  The claims against the defendants are predicated on their activities in support of al Qaeda in the years leading up to the September 11, 2001 terrorist attacks, through which the defendants aided and abetted those attacks and conspired with al Qaeda in relation to same, as well as defendants' own related acts of international terrorism, involving violations of the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 et seq.  *See e.g.* 18 U.S.C. §§ 2333(a), 2333(d), 2339A, 2339B, and 2339C.  By virtue of their acts in support of al Qaeda and the September 11, 2001 terrorist attacks, as described herein, the defendants are subject to civil liability for plaintiffs' injuries pursuant to § 2333 of the ATA, under theories of both primary and secondary liability.

73.    Since at least the bombing of the United States Embassy and military barracks in Beirut in 1983, Congress has been engaged in continuous efforts to combat the threat to U.S. interests posed by international terrorism and the sponsorship of international terrorist organizations.  As early as 1986, Congress created criminal penalties for "[t]errorist attacks abroad against United States nationals."  Omnibus Diplomatic Security and Antiterrorism Act of 1986, Pub. L. No. 99-399, § 1202, 100 Stat. 853, 896 (codified as amended at 18 U.S.C. § 2331).

74.    In the ensuing years, international terrorist activity targeting U.S. interests intensified, leading Congress to take further steps to protect U.S. national security interests, consistent with its authority to "punish crimes against the laws of nations and to carry out the treaty obligations of the United States."  Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 301(a)(2), 110 Stat. 1214, 1247 (codified at 18 U.S.C. § 2339(b)) (AEDPA).

75.    As a result of its intensive analysis over the last four decades concerning the impact of international terrorist activity on our national interests, Congress has reached a number of critical factual and empirical findings concerning the nexus between international terrorist activity and U.S. interests.  Congress has specifically concluded that terrorism is a politically motivated act, and that the activities of international terrorist organizations, and those who sponsor them, are often expressly directed at coercing U.S. policy decisions.

76.    In many cases, terrorist attacks are directed at "moderate governments with which the United States has vigorously endeavored to maintain close and friendly relations" and "threaten [the] social, economic, and political stability of such governments."  *Holder v. Humanitarian Law Project*, 561 U.S. 1, 32 (2010) (alteration in original).  Other terrorist attacks target U.S. military allies, "thereby implicating important and sensitive … security arrangements."  *Id.*

77.    Given these realities, Congress and the Executive Branch have consistently affirmed "Our nation's compelling interest in combatting and deterring terrorism at every level." Statement of Interest of the United States at p. 2, *Sokolow v. Palestine Liberation Org.*, No. 1:04-civ-397 (S.D.N.Y. Aug. 10, 2015) (ECF No. 953-1).

78.    Congress' recognition of the direct nexus between terrorist sponsorship activities abroad and compelling U.S. interests prompted Congress to enact the Antiterrorism Act's civil remedy provision, 18 U.S.C. § 2333, a statute specifically designed to provide jurisdiction for civil

claims brought by U.S. national terrorism victims against those who engage in prohibited acts of international terrorism.

79.    In response to judicial rulings limiting the reach of Section 2333, Congress enacted the Justice Against Sponsors of Terrorism Act (JASTA) on September 28, 2016.

80.    Through JASTA, Congress confirmed that the reach of the ATA's civil remedy provision extends to "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with" a person or organization who commits an act of international terrorism that is the subject of a claim under Section 2333.

81.    Through JASTA, Congress also affirmed a number of critical empirical findings relating to the relationship between such extraterritorial terrorism sponsorship activities and vital interests of the United States.  Specifically, Congress affirmed that "international terrorism affects the interstate and foreign commerce of the United States by harming international trade and market stability, and limiting international travel by United States citizens as well as foreign visitors to the United States."

82.    Consistent with those determinations, Congress expressly affirmed that "persons, entities, or countries that knowingly or recklessly contribute materials or supported resources, directly or indirectly, to persons or organizations that pose a significant risk for committing acts of terrorism that threaten the security of nationals of the United States where the national security, foreign policy, or economy of the United States, necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court in the United States to answer for such activities."

### III.    FACTUAL BACKGROUND

83.    On September 11, 2001, nineteen members of the al Qaeda terrorist organization, fifteen of whom were citizens of the Kingdom of Saudi Arabia, hijacked four commercial airliners, and used those planes as weapons in a coordinated terrorist attack upon the United States and its citizens (the "September 11th attacks").

84.    The September 11th attacks resulted in the tragic loss of several thousand lives, personal injuries to countless other persons, and property damage on a catastrophic scale, including the complete destruction of the World Trade Center Complex.

85.    For al Qaeda and its adherents and supporters, the September 11th attacks were the culmination of a more than decade long campaign to carry out spectacular terrorist attacks against the United States, set in motion with the formation of al Qaeda in 1988.

86.    The success of the September 11th attacks was made possible by the lavish sponsorship al Qaeda received from its material sponsors and supporters, over more than a decade leading up to September 11, 2001.

87.    As further detailed below, defendants Al Rajhi Bank, NCB, and SBG provided material support to al Qaeda over a period of many years, with knowledge of al Qaeda's intent to use resources provided to it to conduct terrorist attacks against the United States, and with the intent that al Qaeda would in fact use the support they provided to achieve that objective.

88.    As further detailed below, the support provided by Al Rajhi Bank, NCB, and SBG enabled al Qaeda to obtain the global strike capabilities necessary to carry out the September 11th attacks, and was essential to the success of those attacks.

## IV.   <u>THE ORIGINS OF AL QAEDA</u>

89.     Al Qaeda has its origins in the jihad against the Soviet occupation of Afghanistan, which served as a rallying point for Islamic extremists in the Middle East, who flocked to Afghanistan to wage "jihad" against the Soviet Union.

90.     Osama bin Laden traveled to Afghanistan in 1980 to participate in the jihad, and gained prominence during this period for his role in establishing the financial and logistical infrastructure that sustained the Arab-Afghan fighters, commonly referred to as the mujahideen. According to the Final Report of the National Commission on Terrorist Attacks Upon the United States (the "9/11 Commission Report"):

> Bin Ladin understood better than most of the volunteers the extent to which the continuation and eventual success of the jihad in Afghanistan depended on an increasingly complex, almost world-wide organization. This organization included a financial support network that came to be known as the "the Golden Chain," put together mainly by financiers in Saudi Arabia and Persian Gulf states. Donations flowed through charities and other non-governmental organizations (NGOs). Bin Ladin and the "Afghan Arabs" drew largely on funds raised by this network, whose agents roamed world markets to buy arms and supplies for the mujahideen or "holy warriors."

*See* 9/11 Commission Report at p. 55.

91.     Throughout the Afghan jihad, the financial support provided by the "Golden Chain" donors flowed to the Arab jihadists through a network of purported charities and Islamic relief organizations, which also provided travel documents, transportation, training, facilities, arms, physical assets, and other support to the mujahideen.

92.     Saudi-based "da'awa" organizations established to propagate the austere Wahhabi variant of Islam formed the core of this support network, including among others the Muslim World League, International Islamic Relief Organization, Saudi Red Crescent Society, and Rabita Trust.

93.     This network of ostensible charities and relief organizations established a vast financial and logistical infrastructure to support the mujahideen opposition to the Soviet occupation of Afghanistan.

94.     At the conclusion of the Afghan jihad, bin Laden determined that the network that supported the mujahideen in Afghanistan should not be abandoned, but rather adapted to serve as a foundation for waging a global jihad against all of the perceived enemies of Islam, and in particular, the United States.

> April 19, 1988 brought victory for the Afghan jihad. Moscow declared it would pull its military forces out of Afghanistan within the next nine months. As the Soviets began their withdrawal, the jihad's leaders debated what to do next.
>
> Bin Ladin (and Abdullah Azzam) agreed that the organization successfully created for Afghanistan should not be allowed to dissolve. They established what they called a base or foundation (al Qaida) as a potential general headquarters for future jihad.

*See* 9/11 Commission Report at p. 56

## V.     AL QAEDA'S OBJECTIVES AND TACTICS

95.     In establishing al Qaeda in 1988, bin Laden sought to create a multi-national Islamic army to challenge the perceived domination of the democratic West, in furtherance of the ultimate objective of establishing a Pan-Islamic Caliphate.

96.     For bin Laden and his followers and supporters, the United States was the source of all problems confronting the Muslim world, to be destroyed at all costs. Accordingly, the United States has been, since al Qaeda's inception, the primary target of bin Laden's organization.

97.     The centerpiece of bin Laden's strategy to fight the United States involved staging high profile terrorist attacks against America and its citizens. Bin Laden firmly believed that such attacks would serve to demonstrate that America was nothing more than a paper tiger, and rally Muslims throughout the world to al Qaeda's cause. Pursuant to this strategy, "Plans to attack the

United States were developed with unwavering single-mindedness throughout the 1990s." *See* 9/11 Commission Report at p. 48.

98.    As a complement to the efforts to attack the United States through terrorist strikes, al Qaeda also sends its members to fight U.S. interests and military personnel in conflict regions throughout the world.

99.    In this context, al Qaeda has been deeply involved in fighting U.S. interests, through both traditional forms of combat and terrorist attacks, in Syria, Iraq, Yemen, Afghanistan, Pakistan, Bosnia, Chechnya, Kosovo, Sudan, Kashmir, Turkey, Indonesia, Malaysia, Algeria, the Philippines, Somalia, Kenya, Tanzania and Egypt.

100.    Al Qaeda's military operations bolster the organization's image among certain segments of the Muslim world (particularly within Saudi Arabia), thereby facilitating al Qaeda's ongoing recruiting and fundraising efforts.  These campaigns also afford the organization an efficient vehicle to provide new members with battle experience, in preparation for terrorist operations and the ongoing military conflict with the United States.  In addition, al Qaeda's financial and operational support for local Islamist and separatist movements has allowed al Qaeda to co-opt local conflicts and organizations to its own ends.  As a result, many pre-existing terror and extremist organizations evolved into al Qaeda proxies, thereby extending al Qaeda's operational capabilities, resources, and sphere of influence.

101.    Al Qaeda's dual strategy of attacking the United States through acts of terrorism and through armed combat in regional conflicts and jihad campaigns fueled al Qaeda's growth and development in the years leading up to the September 11th attacks, and directly enhanced the organization's global strike capabilities.  Indeed, as the 9/11 Commission observed:

> By the time he issued his February 19, 1998 declaration of war, bin Ladin had nurtured (the al Qaeda) organization for nearly ten (10)

years.  He could attract, train, and use recruits for ever more
ambitious attacks, rallying new adherents with each demonstration
that his was the movement of the future.

*See* 9/11 Commission Report at p. 55.

## VI.  THE CRITICALITY OF AL QAEDA'S INFRASTRUCTURE TO THE 9/11 ATTACKS

102.    The support al Qaeda amassed from its supporters during the thirteen years leading

up to September 11, 2001 also enabled bin Laden to build the global infrastructure required to

plan, coordinate, and stage the September 11th attacks.

103.    As the 9/11 Commission correctly concluded, the "9/11 attack was a complex

international operation, the product of years of planning."  In this regard, the 9/11 Report confirms

that plans for the Attacks were carefully vetted through al Qaeda's most senior leadership over a

period of nearly six years, while those leaders were safely ensconced in training camps and safe

houses funded by al Qaeda's financial supporters; that the individuals selected to participate in the

Attacks were chosen from an enormous pool of potential candidates, all of whom were recruited,

trained, and indoctrinated with funds provided by the organization's supporters; and that details of

the plans were revised up until the last minute, through a sophisticated global communication

network capable of evading the surveillance and intelligence operations of the United States and

its allies, the development and existence of which also was dependent on the financial sponsorship

of al Qaeda's supporters.

104.    The September 11th attacks were, in turn, themselves an adaptation of several earlier

al Qaeda plots targeting the civil aviation system, dating to the early 1990s, which were developed

using the resources provided by al Qaeda's sponsors and supporters.

105.    Indeed, al Qaeda's efforts to use aircraft as weapons in a terrorist strike began in

earnest no later than 1993, when bin Laden sent Ihab Mohammed Ali, a naturalized United States

citizen who joined al Qaeda in 1990, to the United States to obtain pilot training. Using al Qaeda funds, Ali underwent training at the Airman Flight School in Norman, Oklahoma, the same flight school where al Qaeda would later send Zacarias Moussaoui to obtain pilot training for purposes of his role in attacking the American homeland. When Ali returned to Sudan after completing his training, bin Laden asked him to assassinate Egyptian President Hosni Mubarak by crashing a plane into Mubarak's aircraft midair. The plot became infeasible when the aircraft Ali was to use for the attack was damaged during training, but the knowledge acquired by al Qaeda in developing the plot directly enhanced its capacity to carry out sophisticated terrorist attacks using planes as weapons.

106.    Around the same time, Khalid Sheikh Mohammed ("KSM"), the mastermind of the September 11th attacks, and his nephew Ramzi Yousef, were in the process of developing a plot to bomb twelve U.S. commercial airplanes over the Pacific Ocean as they flew from Asia to the United States, known as the "Bojinka" or "Manila Air" plot. The plot was disrupted by the Philippine National Police in January 1995 when a chemical fire erupted in an apartment used by Yousef and Abdul Hakim Ali Hashim Murad to plan for the attacks.

107.    The cell that hatched the Bojinka plot, which included KSM and Yousef, was associated with Abu Sayyef Group, an al Qaeda affiliate in the Philippines, and supported by al Qaeda through the Philippine branch of the Interntional Islamic Relief Organization ("IIRO"), headed by bin Laden's brother-in-law Mohammed Jamal Khalifa.

108.    In relation to the Bojinka plot, KSM and Yousef conducted extensive evaluations of civil aviation security protocols, to identify vulnerabilities that could be exploited for purposes of terrorist attacks. The knowledge and expertise acquired in that context, using funding provided by al Qaeda through the IIRO, were vital to the planning and development of the 9/11 plot.

109.    Not long after the Philippine National Police disrupted the Bojinka Plot, KSM, who was well aware U.S. authorities were chasing him, fled to Afghanistan, where he arranged to meet with Osama bin Laden in Tora Bora in 1996.  At the meeting, KSM briefed bin Laden on the Bojinka plot, and a proposal building on that effort that would involve training pilots who would crash planes into buildings in the United States.  That proposal would become the 9/11 operation.

110.    According to the 9/11 Commission, KSM brought the 9/11 operation proposal to bin Laden specifically because "KSM knew that the successful staging of such an attack would require personnel, money, and logistical support that only an extensive and well-funded organization like al Qaeda could provide."  *See* 9/11 Commission Report at p. 149.

111.    As these facts confirm, the seeds for the attacks carried out on September 11, 2001 were planted by al Qaeda many years earlier, and cultivated for more than a decade through al Qaeda's continuous investment in developing terrorist plots involving the civil aviation system, a campaign that was funded by the ongoing contributions of its wealthy patrons and dependent upon the infrastructure that facilitated al Qaeda's global operations.

112.    Based on the findings of its investigation concerning al Qaeda's development during the 13 years preceding the September 11th attacks, the evolution of al Qaeda's efforts to target the United States through plots involving the civil aviation system, and the relationship between al Qaeda's global infrastructure and the organization's operational capability to plan, coordinate and mount the September 11th attacks, the 9/11 Commission reached the following conclusions regarding the basic organizational requirements for staging a sophisticated terrorist attack:

> A complex international terrorist operation aimed at launching a catastrophic attack cannot be mounted by just anyone in any place. Such operations appear to require

• time, space, and ability to perform competent planning and staff work;

• a command structure able to make necessary decisions and possessing the authority and contacts to assemble needed people, money, and materials;

• opportunity and space to recruit, train, and select operatives with the needed skills and dedication, providing the time and structure required to socialize them into the terrorist cause, judge their trustworthiness, and hone their skills;

• a logistics network able to securely manage the travel of operatives, move money, and transport resources (like explosives) where they need to go;

• access, in the case of certain weapons, to the special materials needed for a nuclear, chemical, radiological, or biological attack;

• reliable communications between coordinators and operatives; and

• opportunity to test the workability of the plan.

*See* 9/11 Commission Report at pp. 365-366.

113.    Consistent with the findings of the 9/11 Commission, U.S. counter-terrorism officials have repeatedly affirmed the critical importance of al Qaeda's broader infrastructure and resources to its capacity to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks, including the September 11th attacks, as reflected by the following statements:

> There are some who question the effectiveness of our strategy to prevent terrorism by attacking the financing that supports it. They note that terrorist attacks themselves cost very little money to carry out – the trivial cost of a suicide belt or similar device – and then leap to the conclusion that our efforts to combat terrorism by attacking terrorist resources are wasted or futile.
>
> The 9/11 Commission wisely rejected this point of view. In the first place, the cost of financing terrorist activity cannot be measured by the cost of a primitive destructive act. The maintenance of those terrorist networks, like al Qaeda, which threaten our national security, is expensive – even if a particular attack does not cost much to carry out. As the 9/11 Commission explained, groups like al Qaeda must spend money for many

> purposes – to recruit, train, plan operations, and bribe corrupt officials for example.  If we can eliminate or even reduce their sources and conduits of money, we can degrade their ability to do all of these things, and thus can make them less dangerous.

Testimony of Stuart A. Levey, Undersecretary of Terrorism and Financial Intelligence, August 23, 2004.

> As this Committee knows well, tracking and combating terrorist financing are critical facets of our overall efforts to protect our citizens and other innocents around the World from terrorist attacks…. While any single terrorist attack may be relatively inexpensive to carry out, terrorist groups continue to need real money.  They depend on a regular cash flow to pay operatives and their families, arrange for travel, train new members, forge documents, pay bribes, acquire weapons and stage attacks. Disrupting money flows stresses terrorist networks and undermines their operations.  In recent months, we have seen at least one instance of what we look for most – a terrorist organization indicating that it could not pursue sophisticated attacks because it lacks adequate funding.

Testimony of Stuart A. Levey, Undersecretary of Terrorism and Financial Intelligence, before the House Financial Services Subcommittee on Oversight and Investigations, July 11, 2006.

> (T)errorist organizations require significant funding.  Although individual terrorist attack may be inexpensive, terrorist organizations require far more than explosives to sustain themselves.  They need money to train, recruit, pay operatives and their families, travel, bribe officials, procure cover and false documents, as well as purchase arms.  If implemented effectively, targeted financial sanctions can put terrorist organizations in a financial box, effectively depriving them of the resources they need to conduct this range of activity.

Prepared remarks of Daniel L. Glaser, Acting Assistant Secretary for Terrorist Financing and Financial Crimes, before the Annual Meetings Program of Seminars: *The Importance of Expanding Targeted Financial Transactions Programs Around the Globe: Challenges and Opportunities*, September 23, 2005.

> The primary reason why combating the financing of terrorism efforts are both necessary and important is that terrorist groups need money.  Although mounting an individual terrorist attack is relatively inexpensive, the cost to maintain the infrastructure to support terrorist activities is high.  Terrorist networks need cash to train, equip and pay operatives, to secure materials and to promote

their cause.  To eliminate or reduce the cell's means of raising and transferring funds is to significantly degrade that cell's capabilities.

*The Money Trail: Finding, Following and Freezing Terrorist Finances*, Michael Jacobsen and Matthew Levitt (Deputy Assistant Secretary for Intelligence and Analysis of the Treasury Department from 2005 – 2007), November 2008, at p. 3.

> Although manning a terrorist attack is relatively inexpensive, the cost to maintain a terrorist infrastructure is high.  Terrorist networks need cash to train, equip and pay operatives and their families and to promote their causes.  Recruiting, training, traveling, bribing corrupt officials and other such activities also cost money.  Limiting their ability to raise funds therefore limits their ability to function.

*Follow the Money – The Obama Administration Should Continue to Track How Terrorists get Their Money*, Michael J. Jacobsen and Matthew Levitt, December 23, 2008

114.    Given the financial needs of al Qaeda and other global terrorist organizations that threaten our national security, Congress has concluded that money is the lifeblood of terrorism, and that any contribution to a terrorist organization furthers acts of terrorism.  The State Department has affirmed in proceedings before the United States Supreme Court that "[t]he experience and analysis of the U.S. government agencies charged with combating terrorism strongly suppor[t]" Congress's findings on those points.

115.    In light of those conclusions, the United States has affirmed that the imposition of civil liability on sponsors and supporters of terrorism pursuant to the ATA is an important component of the United States' national security strategy, which serves to deter the financing of terrorism and thereby deprive terrorist organizations of the resources needed to carry out sophisticated terrorist attacks, like the September 11th attacks.  As Deputy Secretary of State, Anthony J. Blinken recently affirmed in an affidavit filed on behalf of the United States in proceedings before a federal district court in the Southern District of New York:

> The ability of victims to recover under the ATA also advances U.S. national security interests.  The law reflects our nation's compelling interest in combatting and deterring terrorism at every

level, including by eliminating sources of terrorist funding and
holding sponsors of terrorism accountable for their actions.
Imposing civil liability on those who commit or sponsor acts of
terrorism is an important means of deterring and defeating terrorist
activity.  Further, compensation of victims at the expense of those
who have committed or supported terrorist acts contributes to U.S.
efforts to disrupt the financing of terrorism and to impede the flow
of funds or other support to terrorist activity.

## VII.  AL QAEDA'S FOUNDATION OF SUPPORT IN SAUDI ARABIA: WEALTHY DONORS, PURPORTED CHARITIES, AND ISLAMIC BANKS

116.  Given the global infrastructure and resource needs necessary to stage spectacular international terrorist attacks against the United States, the acquisition of the global strike capabilities employed by al Qaeda on September 11, 2001 required massive funding on an ongoing basis over a period of many years, through secure and reliable channels.

117.  Indeed, in the wake of the September 11th attacks, U.S. counter-terrorism officials estimated that al Qaeda required $35 million annually to sustain the infrastructure that supported the September 11th attacks, a view that was endorsed by the 9/11 Commission as well.  Al Qaeda's budget included approximately $20 million in annual support for the Taliban alone, in exchange for which bin Laden and al Qaeda received safe haven in Afghanistan and other support from the Taliban regime, from at least 1996 through September 11, 2001.  The safe haven provided by the Taliban under this arrangement was essential to the success of the September 11th attacks.  As former CIA and National Security Council official Bruce Riedel has explained, "Without the Taliban safe haven before 9/11, the attacks never would have occurred.  Al Qaeda needed its Afghan sanctuary."

118.  Osama bin Laden satisfied the immense fundraising needs required to finance al Qaeda's safe haven in Afghanistan and build an infrastructure capable of carrying out sophisticated international terrorist attacks by adapting the network developed during the Afghan jihad, relying from al Qaeda's inception on contributions from wealthy supporters (primarily in Saudi Arabia),

who knowingly directed donations to al Qaeda through Saudi-based Islamic da'awa organizations (frequently described as "charities") closely affiliated with bin Laden's terror organization. In many cases, these wealthy donors also held positions of authority or influence with one or more of al Qaeda's charity fronts, and used businesses under their control to provide essential support and assistance to bin Laden and al Qaeda.

119.    As the United Nations Security Council Committee concerning al Qaeda and the Taliban succinctly explained:

> From its inception, al-Qaida has relied heavily on charities and donations from its sympathizers to finance its activities. Charities provide al-Qaida with a very useful international channel for soliciting, collecting, transferring and distributing the funds it needs for indoctrination, recruitment, training, and logistical and operational support. These funds are often merged with and hidden among funds used for other legitimate humanitarian or social programs. Al-Qaida supporters and financiers have also established front charity networks whose main purpose is to raise and deliver funds to al-Qaida. The roots of these charity networks stem from the anti-Soviet Jihad in Afghanistan during the last 1980s. During that time, al-Qaida could draw on a number of state-assisted charities and other deep pocket donors that supported the anti-Soviet cause.

120.    U.S. intelligence and government reports similarly confirm the essential support provided to al Qaeda by wealthy donors with longstanding connections to Osama bin Laden. For example, the 9/11 Commission's staff *Monograph on Terrorist Financing* states that after bin Laden relocated al Qaeda from Sudan to Afghanistan in 1996, he "drew on the ties to wealthy Saudi nationals that he developed during his days fighting the Soviets in Afghanistan" to reinvigorate al Qaeda, and that purported charities were "used as conduits to transfer funds from donors to al Qaeda leaders," providing funding "to the tune of approximately $30 million per year."

121.    A November 14, 2002 CIA report titled "*Saudi-Based Financial Support for Terrorist Organizations*" similarly confirms that "Saudi Arabia is a key base of financial support

for al-Qa'ida" and that "Most of the money originates from wealthy individuals, fundraisers who solicit smaller donations, and diversions from non-governmental organizations (NGOs)."

122.    A separate April 25, 2002 CIA report concerning sources of al Qaeda's vast financing, titled "*Identifying Al-Qa'ida's Donors and Fundraisers: A Status Report*," likewise concludes that "wealthy individuals in the Arabian Peninsula and grassroots supporters from around the world are critical funding sources for al-Qa'ida," and documents how wealthy financiers within al Qaeda's inner-circle use purported charities and businesses as middlemen in an effort to conceal their roles in channeling resources to bin Laden's organization:

> Donors generally channel money intended for terrorist-related activities through middlemen – including nongovernmental organizations (NGOs), mosques, fundraisers, and businessmen – rather than giving the funds directly to Bin Ladin or other senior al Qa-ida members.  This practice hides the donors' role and allows them to deny knowing the funds went to terrorists.

123.    The "charities" that operated hand-in-glove with al Qaeda within this framework during the years leading up to the September 11th attacks included a number of the Saudi organizations that had worked closely with bin Laden during the Afghan jihad, such as the Muslim World League ("MWL"), International Islamic Relief Organization ("IIRO"), Saudi Red Crescent Society ("SRC"), and Rabita Trust.  In addition, several Saudi "charities" formed in the years following al Qaeda's establishment served as critical components of al Qaeda's infrastructure as well, including Al Haramain Islamic Foundation, Saudi High Commission for Relief of Bosnia & Herzegovina ("SHC"), Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC"), World Assembly of Muslim Youth ("WAMY"), Al Haramain al Masjil al Aqsa, and Muwafaq Foundation (a/k/a "Blessed Relief").

124.    These Saudi-based so-called charities were not merely fronts for supporting al Qaeda, but fully integrated components of al Qaeda's financial and logistical support

infrastructure, which were repeatedly implicated in the sponsorship of al Qaeda and other terrorist organizations during the years preceding the September 11th attacks in public reporting in the Arab world. In addition to serving as the conduits for the vast majority of the funding provided by al Qaeda's wealthy patrons, these organizations were intimately involved in all aspects of al Qaeda's operations, and allowed al Qaeda to use their infrastructures and resources as platforms for carrying out terrorism. As further detailed in the allegation of facts concerning the terrorist activities of the so-called charities included as Exhibit A, al Qaeda's charity collaborators have: (1) raised and laundered funds on behalf of Islamic terrorist organizations and associated separatist movements, including al Qaeda; (2) channeled donated funds to Islamic terrorist organizations, fighters and associated separatist movements, including al Qaeda; (3) provided financial and logistical support and physical assets to Islamic fighters and terrorists, including al Qaeda; (4) directly participated in al Qaeda's terrorist activities, including the planning, coordination, funding and execution of terrorist attacks; (5) permitted Islamic fighters and terrorists, including al Qaeda members, to use ostensible employment with their organizations as a vehicle for gaining access to conflict regions, thereby allowing those individuals to carry out militant and terrorist activities in those areas; (6) performed reconnaissance within conflict regions on behalf of Islamic terrorist organizations and separatist movements, including al Qaeda; (7) served as liaisons to localized terrorist organizations on behalf of al Qaeda, thereby assisting al Qaeda in expanding its operational base and sphere of influence; (8) funded and facilitated shipments of arms and supplies to Islamic terrorist organizations and associated separatist movements, including al Qaeda; (9) funded camps used by al Qaeda and associated jihadist organizations to train soldiers and terrorists, including camps used to train the September 11th hijackers; (10) actively recruited new members for Islamic terrorist organizations and associated separatist movements, including al Qaeda; (11)

worked throughout the World to spread al Qaeda's jihadist ideology and draw new adherents to its cause; (12) served as channels for distributing information and documentation within Islamic terrorist organizations and associated separatist movements, including al Qaeda, and from Islamic terrorist organizations and separatist movements to the media; (13) disseminated publications designed to advance al Qaeda's radical Islamist ideology throughout the Muslim world and legitimize violent jihad against Christians and Jews on the grounds that they are "infidels" who do not deserve to live; and (14) openly advocated for young Muslims to take up arms against Western and democratic societies, including the United States.

125.    Given the intimacy of the so-called charities' collaborations with al Qaeda and their complete integration into al Qaeda's infrastructure, Juan Zarate ("Zarate"), who served as both deputy national security advisor for combatting terrorism and the first ever assistant secretary for the Treasury for terrorist financing and financial crimes, observed in his book *Treasury Wars* that "Distinguishing between some of the international Wahhabi organizations and terrorist support networks was nearly impossible, especially when support for Al Qaeda and support for spreading Wahhabi beliefs seemed to blend together so seamlessly.  This was true in the work of some of the branches of Saudi-based institutions, such as the International Islamic Relief Organization (IIRO)."

126.    Because charities generally do not generate revenue on their own, the financial support and other assistance that flowed through al Qaeda's integrated charity fronts was deeply reliant and dependent upon the financial contributions from al Qaeda's wealthy patrons.  In addition, because of the scope and complexity of al Qaeda's global operations, al Qaeda required access to the international banking system to facilitate the distribution of its funds, including unusual transactions carried out through its charities' accounts, without triggering any of the

regulatory devices developed by the international banking system to identify illicit financial transactions. Several of al Qaeda's wealthy sponsors, including in particular Suleiman al Rajhi and Khalid bin Mahfouz, provided essential assistance on that front as well, through banks under their control.

127.    In the wake of the September 11th attacks, the United States determined that the fight against al Qaeda and prevention of future attacks like those carried on September 11, 2001 urgently required that the United States disrupt and dismantle the financial and logistical support network of wealthy donors, charities, and banks that had made 9/11 possible. As Juan Zarate has explained the mindset of U.S. national security and counter-terrorism officials at the time:

> The next attacks needed to be crippled and stopped. Following and disrupting the money flows within the Al Qaeda system became an imperative. The Al Qaeda financial networks – charities, deep-pocket donors, and front companies – and the means by which Al Qaeda moved money around the world – banks, couriers, wire transfers, hawaladars – would become our targets.

128.    With those goals in mind, U.S. intelligence and law enforcement agencies established an array of new programs and inter-agency initiatives focused on identifying the components of al Qaeda's support network, and embarked on a global campaign to dismantle al Qaeda's material support infrastructure.

129.    These efforts received a critical boost in March of 2002, when Bosnian authorities raided the Sarajevo offices of Benevolence International Foundation ("BIF"), another Saudi al Qaeda front charity. During the raid, Bosnian police seized weapons, plans for making bombs, booby-traps, and false passports. Even more significantly, authorities recovered a computer hard drive containing a trove of internal al Qaeda documents chronicling the terrorist organization's formation and details of its financial and material support infrastructure, stored in a file named "Tareekh Osama" (Osama's History).

130.     In a subsequent federal prosecution of BIF's Chief Executive Officer, Enaam Arnaout, the Department of Justice presented a detailed analysis of the most significant documents within the Tareekh Osama file, based on the U.S. government's analysis of the documents themselves, testimony provided by former al Qaeda members, and intelligence gathered from other sources.  *See* Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements, *United States of America v.  Enaam Arnaout*, Case No.  02-CR-892 (N.D.  Ill., filed Jan.6, 2003), available at http://fl1.findlaw.com/news.findlaw.com/wsj/docs/bif/usarnaout10603prof.pdf, and incorporated herein by reference.

131.     In that filing, the United States revealed that the Tareekh Osama file included a handwritten list of al Qaeda's most important wealthy donors – "the people referred to within al Qaeda as the 'Golden Chain.'"

132.     According to Zarate, "Prominent and wealthy names long familiar to law enforcement appeared on the list.  Not surprisingly, many of these men were prominent Saudis – *such as Suleiman al Rajhi and Khalid bin Mahfouz*."  (emphasis supplied).

133.     Among others, the list also identified the "bin Laden brothers" as key donors to their sibling Osama bin Laden's terrorist organization.

134.     The 9/11 Commission both expressly endorsed and extensively relied upon the Department of Justice's analysis and treatment of the Tareekh Osama documents, including the Golden Chain, in its Final Report, and the Department of Treasury has cited inclusion on that list as a basis for designating individuals as al Qaeda sponsors pursuant to Executive Order 13224.

135.     In addition, Jamal al Fadl, who served as al Qaeda's finance manager during the 1990s and became a cooperating witness for the United States after defecting from bin Laden's

organization, authenticated the Golden Chain document in testimony provided to U.S. officials, confirming that it identified members of the "Golden Chain," whom al Fadl described as "wealthy individuals from the Gulf region who provided Bin Laden and Al Qaeda with money on a regular basis."

136.    The funding provided by the Golden Chain donors, including Suleiman al Rajhi, Khalid bin Mahfouz and bin Laden family members, was critical to the development of the al Qaeda organization, sustained al Qaeda in the years leading up to the September 11th attacks, and enabled bin Laden to acquire the resources essential to those Attacks.    Indeed, the 9/11 Commission specifically concluded that bin Laden "enjoyed a strong financial position in Afghanistan, *thanks to Saudi and other financiers associated with the Golden Chain*." (emphasis supplied).

137.    These wealthy patrons were "not just passive contributors, but demanding investors in a cause.    Over time, the donor class would grow increasingly demanding of Al Qaeda, asking to hear directly from bin Laden and requiring that their funds be leveraged to launch significant attacks." *Treasury Wars* at p. 80.

138.    In the years since the discovery of the Golden Chain, a broad spectrum of evidence has emerged, principally as a result of U.S. and international counter-terrorism investigations, documenting myriad connections between members of the Golden Chain and components of al Qaeda's financial and logistical infrastructure, and confirming that the support provided to al Qaeda by several members of the Golden Chain extended well beyond their financial contributions.

139.    This evidence confirms that Suleiman al Rajhi and Khalid bin Mahfouz were particularly active in using multiple platforms under their control to provide various forms of

support to al Qaeda, and places both at the very center of al Qaeda's financial and logistical support network. Most significantly to the present action, and as detailed below, both aggressively deployed the banks they respectively controlled, Al Rajhi Bank and NCB respectively, to provide financial services, funding and other support to bin Laden and al Qaeda. In addition, both established their own alleged charities to serve as fronts for delivering material support and resources to al Qaeda.

140.    This evidence likewise demonstrates that bin Laden family members who directed and controlled the family construction conglomerate, Saudi Binladin Group ("SBG"), where Osama bin Laden was a shareholder for many years following al Qaeda's formation, used their company to provide critical construction services and other assistance to al Qaeda, both in Sudan and Afghanistan.

141.    During the many years that Al Rajhi Bank, NCB, and SBG were providing essential support to al Qaeda, bin Laden's intent to use that support to plan and carry out terrorist attacks against the United States was well known to those organizations and their principals.

142.    In fact, upon returning to Saudi Arabia at the conclusion of the Afghan jihad and resuming his position with SBG, bin Laden made no effort to conceal his jihadist ambitions in public speeches within the Kingdom. Bin Laden was greeted upon his return as a hero by many in the Saudi populace, who were astonished that a wealthy member of the Saudi elite had risked his life to carry out jihad. Bin Laden was in great demand to give speeches and interviews, and made clear in his statements his continuing dedication to jihad against the perceived enemies of Islam.

143.    Speaking in 1988, bin Laden expressly affirmed what he believed to be the personal obligation of all Muslims to wage jihad against the enemies of Islam, stating as follows:

> The blessing of jihad in the cause of God – the peak of true Islam, which people in this age have forgotten is a religious duty…Praise be to God for allowing us to perform jihad in Afghanistan as he did for the best of men, our Prophet, may God's peace and prayers be upon him…I would like to advise my brother Muslims in all parts of the East and West to take the initiative and leave what they are doing to assist in raising the banner of jihad for the cause of God. This banner is the best banner and the mujahidin are the best people…May God accept our and your prayers and our urging of believers to perform jihad in order to deter the infidel forces and be truthful.

144.    Speaking in 1990 to an audience of hundreds in the Bin Laden family mosque in Jeddah, bin Laden singled out the United States as the primary target of this global jihad, asserting that "[t]he Americans won't stop their support of Jews in Palestine until we give them a lot of blows.  They won't stop until we do jihad against them."

145.    In that same year, bin Laden organized and funded the travel of an estimated 4,000 mujahideen fighters to Afghanistan for training, as part of his ongoing efforts to build his jihadist army.

146.    Bin Laden continued to deliver diatribes against the United States after relocating to Sudan.  In early 1992, bin Laden and the al Qaeda leadership issued a fatwa calling for jihad against the Western "occupation" of Islamic lands, specifically singling out the United States for attack.  *See* 9/11 Commission Report at pp. 57, 59.

147.    In the ensuing years bin Laden gave frequent lectures in which he declared the need to cut off "the head of the snake," referring to the United States.

148.    In 1996 bin Laden issued his notorious fatwa, tellingly entitled "Declaration of War against the Americans Occupying the Land of the Two Holy Places," asserting that "the occupying American enemy is the principal and the main cause of the situation.  Therefore efforts should be concentrated on destroying, fighting and killing the enemy until, by the Grace of Allah, it is completely defeated."

149.    In his equally famous 1998 fatwa, bin Laden declared "The ruling to kill the Americans and their allies – civilians and military – is an individual duty for every Muslim who can do it in any country in which it is possible to do it…." and "We – with God's help – call on every Muslim who believes in God and wishes to be rewarded to comply with God's order to kill the Americans and plunder their money wherever and whenever they find it."

150.    Al Qaeda demonstrated its intent to use resources provided to it by its sponsors to attack the United States through its actions as well, as confirmed by its role in the 1992 attacks on U.S. soldiers in the Battle of Mogadishu, 1993 World Trade Center bombings, 1995 Bojinka plot, 1996 Khobar bombing attacks, 1998 bombings of U.S. embassies in Africa, and 2000 attack on the USS Cole.

151.    Even more fundamentally, bin Laden's status as an organizational leader of a jihad movement and his ambition to target America were well known to bin Laden's inner-circle, including the members of the Golden Chain.  To begin with, these prominent Saudis were intimately familiar with bin Laden's role as a logistical, financial and operational organizer of the Afghan jihad, and specifically aware that bin Laden and the other young Saudis who had traveled to Afghanistan to wage jihad had no intention of abandoning the cause.  From their own roles in supporting the Afghan jihad, these wealthy donors also knew that several of the chief organizers of the Afghan jihad network remained embedded in senior positions within the Saudi charities, and therefore had access to the resources of those charities in relation to their ongoing jihadist efforts.  And, the jihadist worldview bin Laden was promoting was firmly grounded in Wahhabi ideology, and shared by al Qaeda's wealthy patrons.

152.    It was within this framework that Al Rajhi Bank, NCB and SBG delivered their critical support and sponsorship to bin Laden and al Qaeda.

## AL RAJHI BANK

153.    Al Rajhi Bank is a Saudi Arabia based financial institution focusing on shariah compliant banking and investment products, with over five hundred (500) branch offices within the Kingdom.

154.    Founded in 1957 by Suleiman Abdel Aziz al Rajhi and his brother Saleh al Rajhi, Al Rajhi Bank was, at all times material hereto, a family owned enterprise.  Suleiman Abdel Aziz al Rajhi was the Chairman, Managing Director, and largest shareholder of Al Rajhi Bank during all times relevant to this action.  Saleh Abdulaziz al Rajhi is the eldest brother of Suleiman and has been Chairman of Al Rajhi Bank.  Numerous al Rajhi family members have held senior positions in Al Rajhi Bank as well.

155.    Based on evidence demonstrating that Al Rajhi Bank was one of al Qaeda's most essential and critical partners in the years preceding 9/11, U.S. national security and counter-terrorism officials made the disruption of Al Rajhi Bank's support for al Qaeda a central focus of their effort to dismantle al Qaeda's financial and logistical support infrastructure.

156.    The nature and scope of the collaboration between Al Rajhi Bank and al Qaeda that prompted the United States to focus on the bank were detailed in a 2003 Report of the Central Intelligence Agency.  According to that report:

> Al-Rajhi Bank: Conduit for Extremist Finance (S/NF)
>
> Islamic extremists have used Al-Rajhi Banking & Investment Corporation (ARABIC) since at least the mid-1990s as a conduit for terrorist transactions, probably because they find the bank's vast network and adherence to Islamic principles both convenient and ideologically sound.  Senior al-Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank.  Reporting indicates that senior al-Rajhi family members control the bank's most important decisions and that ARABIC's principal managers answer directly to Sulayman. The al-Rajhis know they are under scrutiny and have moved to conceal their activities from financial regulatory authorities.

157.    The Wall Street Journal ("WSJ") reviewed the 2003 report, along with other reports authored by the CIA and other U.S. agencies concerning Al Rajhi Bank's extensive sponsorship of al Qaeda and allied terrorist organizations, and issued a detailed report in 2007 describing the principal findings of U.S. intelligence investigations. *See* July 26, 2007 Report by Glenn Simpson of the Wall Street Journal, titled *U.S. Tracks Saudi Bank Favored By Extremists*.

158.    According to the WSJ, the U.S. intelligence reports confirm that Al Rajhi Bank played a critical role in facilitating the terrorist activities of al Qaeda's integrated charity fronts, and "describe how Al Rajhi Bank has maintained accounts and accepted donations for Saudi charities that the U.S. and other nations have formally designated as fronts for al Qaeda or other terrorist groups." For example, the intelligence reports indicate that Al Rajhi Bank maintained at least twenty-four (24) accounts and handled unusual transactions for the Al Haramain Islamic Foundation, "a charity that Treasury officials say has acted as a front for al Qaeda in 13 countries." The report states that in 2000, a top official from al-Haramain deposited $130,000 in $1,000 traveler's checks into an Al Rajhi account in Riyadh. According to a U.S. indictment, the funds were then sent to al-Qaeda fighters in Chechnya. In connection with the resulting federal prosecution of an al Haramain official, the U.S. government issued an administrative subpoena to Al Rajhi Bank, requesting that Al Rajhi Bank produce documents relevant and essential to the prosecution. Al Rajhi Bank refused to comply.

159.    Consistent with Suleiman al Rajhi's inclusion on the Golden Chain, the intelligence reports reviewed in the article also document the longstanding involvement of Suleiman al Rajhi and al Rajhi family members in supporting extremists through purported charities, explaining that "Mr. Al Rajhi and family members have been major donors to Islamic

charities that are suspected by Western intelligence agencies of funding terrorism, according to

CIA reports and federal-court filings by the Justice Department."

160.    Confirming the depth of Al Rajhi Bank's commitment to supporting al Qaeda and

related terrorist organizations, the "2003 CIA Report claims that a year after Sept. 11, with a

spotlight on Islamic charities, Mr. Al Rajhi ordered Al Rajhi Bank's board 'to explore financial

instruments that would allow the bank's charitable contributions to avoid official Saudi

scrutiny.'"  A few weeks earlier, "Mr. Al Rajhi 'transferred $1.1 billion to offshore accounts –

using commodity swaps and two Lebanese banks – citing a concern that U.S. and Saudi

authorities might freeze his assets.'"

161.    The 2003 CIA Report also discusses efforts by Suleiman and Saleh al Rajhi to

conceal and disguise unusual transfers through purported charities.  The report says that

Suleiman and Saleh transferred $4 million to parties in Germany and Pakistan in December 1998

using "a unique computer code to send funds at regular intervals to unspecified recipients,

suggesting that they were trying to conceal the transactions and that the money may have been

intended for illegitimate ends."

162.    The U.S. investigations also confirmed that al Qaeda and other terrorist

organizations had absolute confidence in Al Rajhi Bank's commitment to their terrorist cause, as

reflected by the United States' finding that extremists "ordered operatives in Afghanistan,

Indonesia, Pakistan, Saudi Arabia, Turkey, and Yemen" to use Al Rajhi Bank.

163.    Consistent with those directives, U.S. investigations have identified numerous

instances in which al Qaeda members used accounts at Al Rajhi Bank to fund and facilitate

terrorist attacks.  For example, money was funneled to the Hamburg, Germany al Qaeda cell

through the Al Rajhi Bank to businessmen Mahmoud Darkazanli and Abdul Fattah Zammar,

who in turn provided the al Qaeda cell of September 11th hijackers with financial and logistical support. Through Al Rajhi Bank, September 11th hijacker Abdulaziz al Omari received funds into his Al Rajhi Bank Account Nos.: ----------6080, ----0061, and Visa Debit Card No. ---- - ---- - ---- -5747. Al Omari frequently utilized a credit card drawn on Al Rajhi Bank in the planning of the attacks. On September 7, 2001, four days before the 9/11 attacks, al Omari received a wire transfer from Al Rajhi Bank, Buraidah Branch, Jeddah, Saudi Arabia.

164.    Further, Mamduh Mahmud Salim, convicted mastermind of the 1998 embassy bombings in Kenya and Tanzania, was carrying records of an Al Rajhi account when arrested in Germany in 1998.

165.    U.S. investigations also documented very hands-on dealings between Al Rajhi Bank and terrorists at operational levels. In this regard, the 2003 CIA Report says that Al Rajhi Bank couriers "delivered money to the Indonesian insurgent group Kompak to fund weapons purchases and bomb-making activities." Kompak is an al Qaeda affiliate, which also received funding through al Haramain Islamic Foundation.

166.    A separate November 16, 2001 U.S. intelligence memo states that a money courier for Osama bin Laden's second-in-command, Ayman al Zawahiri, traveled on a visa that Al Rajhi Bank had obtained for him. And, when authorities raided the Kenya home of Wadi el Hage, the al Qaeda member who served as Osama bin Laden's personal secretary and is currently serving a life sentence for his role in the embassy bombings, his address book contained personal contact information for Saleh al Rajhi.

167.    Consistent with the findings of U.S. intelligence agencies, Zacarias Moussaoui, the only al Qaeda member convicted to date for involvement in the September 11th attacks, has testified that Osama bin Laden personally described Al Rajhi Bank to him as "like a good

brother."  Moussaoui explained that Al Rajhi Bank was responsible for "moving money around" for al Qaeda, and was one of the main supporters of the Saudi charity fronts used by al Qaeda, including the Al Haramain Islamic Foundation.

168.    Faced with a wealth of compelling evidence of Al Rajhi Bank's long-standing material support for al Qaeda, "officials from the National Security Council, CIA, Treasury and State Departments debated a proposal for legal and political action against the bank, including the possibility of covert operations such as interfering with the bank's internal operations," according to the WSJ.  U.S. officials further debated designating the bank pursuant to Executive Order 13224, an action that can only occur where persons knowingly "assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, such acts of terrorism."  Ultimately, U.S. officials chose to seek reforms of the bank via direct negotiations with the Saudi government, and there have since been significant leadership and managerial changes at the bank.  Of particular note, Suleiman al Rajhi stepped down as head of the bank and relinquished his control over it.

169.    U.S. State Department diplomatic cables confirm the urgency and gravity of the engagements between U.S. officials and their Saudi counter-parts concerning Al Rajhi Bank's sponsorship of al Qaeda.  The cables indicate that U.S. officials conveyed their "real concerns about the financial activities facilitated by Al-Rajhi" to senior Saudi officials, and sought unprecedented reform at Al Rajhi Bank in the years following the September 11th attacks.

170.    According to a September 27, 2004 cable titled *"Terrorist Financing: Al-Rajhi Bank,"* Treasury Assistant Secretary Juan Zarate met with Saudi banking officials and explained that the United States needs "to be assured that Al-Rajhi is doing everything possible regarding

compliance and cooperation. Particular accounts of concern need to be investigated and the bank's compliance structure needs to be reviewed."

171. After U.S. officials "provided the Saudi government with information documenting specific instances of terrorists using the Al Rajhi Bank, including information about specific accounts and transactions of interest," Saudi Arabia agreed to conduct a joint review with Treasury Department officials "to ensure the institution is not operating in a way that provides safe haven for the financial transactions of terrorists and their supporters."

172. A November 25, 2004 diplomatic cable titled *"Joint Examination of Al Rajhi Bank Through the Joint Terrorist Financing Task Force,"* bluntly explains the reason underlying the diplomatic engagements with the Saudis concerning the bank, confirming that Al Rajhi Bank had been "used by al Qaida and like-minded terrorist groups."

173. Separate evidence reveals that Al Rajhi Bank both funded and provided financial services to virtually all of al Qaeda's most critical charity fronts, including the Muslim World League ("MWL"), International Islamic Relief Organization ("IIRO"), World Assembly of Muslim Youth ("WAMY"), Benevolence International Foundation ("BIF"), Al Haramain Islamic Foundation, and the Saudi High Commission for Relief of Bosnia & Herzegovina ("SHC"), among others.

174. In addition to maintaining accounts and facilitating transactions for those organizations, Al Rajhi Bank advertised the existence and numerical designation of the accounts it maintained for those charities throughout the Muslim world, thereby assisting them in their fundraising activities. In addition, Al Rajhi Bank contributed its own zakat and haram funds to these and other al Qaeda fronts. At all times relevant, Al Rajhi Bank and the al Rajhi family members, including Suleiman al Rajhi, were expressly aware that the charities for which Al

Rajhi Bank provided financial services and funding were al Qaeda fronts, and that the bank was being used as a vehicle for laundering funds on behalf of, and transferring funds to, that terrorist organization. Nevertheless, Al Rajhi Bank continued to maintain those accounts and to directly fund the charities.

175. The intimacy of Al Rajhi Bank's collaboration with al Qaeda's integrated charity arms in furtherance of al Qaeda's terrorist activities, and the bank's specific intent that its services and funding on behalf of those charities would be used by al Qaeda to attack the United States, is illustrated by the relationships and course of dealings among Al Rajhi Bank, Suleiman al Rajhi, and the IIRO.

176. According to a U.S. State Department diplomatic cable, "Usama bin Ladin used the entire IIRO network for his terrorist activities."

177. As further reflected by the factual allegations as to the IIRO set forth in Exhibit A, the IIRO worked hand-in-glove with al Qaeda on both financial and operational levels throughout the world, and was repeatedly implicated in terrorist activities in the years preceding the September 11th attacks. Numerous IIRO offices were raided in connection with al Qaeda-related terrorism investigations prior to 9/11, and several IIRO branches were closed as a result of those investigations. These actions against the IIRO were closely monitored by IIRO's senior leadership in Saudi Arabia, and widely reported in media in Saudi Arabia and in the countries where the actions took place. Meanwhile, internal financial reporting within the IIRO confirmed extensive financial irregularities and diversions within its global offices.

178. Throughout the period during which the IIRO was repeatedly implicated in terrorist activities, Al Rajhi Bank maintained numerous accounts for the IIRO, providing a full complement of financial services with respect to those accounts, while also working with the

IIRO to solicit donations to those accounts.  In certain cases, Al Rajhi Bank and the IIRO made little effort to hide the fact that donations to those accounts would be used to support terrorist activities.  For instance, Al Rajhi Bank handled IIRO "charitable" contributions intended to benefit suicide bombers by directing Al Igatha (IIRO) Journal advertisements toward needs in Somalia, Sri Lanka, India, and the Philippines under IIRO Account No. ----- for "the action most loved by Allah."

179.    Al Rajhi Bank also collected charitable donations on behalf of Sanabel al Kheer ("Seeds of Charity"), the financial/investment arm of the IIRO, depositing the donations into Sanabel's Al Rajhi Bank Account No. -----.  Sanabel al Kheer, which the IIRO owns and controls, was established to make investments to support the IIRO's charitable operations.  Like the IIRO, Sanabel al Kheer was repeatedly implicated in terrorist activities in the years prior to 9/11 as well.  Of particular note, an FBI investigation implicated the U.S. arm of Sanabel al Kheer in the financing of the African embassy bombing attacks.

180.    Meanwhile, several senior Al Rajhi Bank officials were simultaneously serving as senior officials of the IIRO and/or Sanabel.  Most notably, Suleiman al Rajhi served on the Executive Council of the IIRO, along with several other members of the Golden Chain.  Suleiman al Rajhi also served on the Board of Trustees of Sanabel, Inc., the U.S.-based arm of Sanabel al Kheer, again along with another member of the Golden Chain.  Thus, Suleiman al Rajhi was simultaneously the head of Al Rajhi Bank, and a senior official of several of the very al Qaeda charity fronts extensively sponsored and supported by Al Rajhi Bank.

181.    By virtue of the leadership positions held by Al Rajhi Bank officials within the IIRO and Sanabel al Kheer, including most notably those held by Suleiman al Rajhi himself, those Al Rajhi Bank officials received express and repeated notifications of the pervasive

involvement of the IIRO and its affiliates in supporting al Qaeda and terrorist activities.  Indeed, in addition to the widespread public reporting concerning the terrorism investigations of the various IIRO offices, those investigations were closely monitored by IIRO leadership in Saudi Arabia, including by the members of the IIRO Executive Committee.

182.    In the face of this information, Al Rajhi Bank continued to provide funding and a broad range of financial services to the IIRO and Sanabel al Kheer, with an express awareness that those entities were deeply integrated into al Qaeda's infrastructure, and using the services and funding provided by Al Rajhi Bank to advance al Qaeda's efforts to attack the United States.

183.    Al Rajhi Bank was generous in its support of other of al Qaeda's charity arms as well, providing not only financial services but significant funding as well.  Al Rajhi Bank's own contributions to al Qaeda charities included:  a 1994 $533,333 donation to the Saudi High Commission ("SHC"); a 1995 $400,000 donation to the SHC; and an $80,000 donation to the SHC in 1996; while collecting donations for Bosnia.

184.    The evidence concerning Al Rajhi Bank's sponsorship of al Qaeda through multiple platforms under the direction of Suleiman al Rajhi is, in turn, simply part of a far broader mosaic of evidence demonstrating Suleiman al Rajhi's pervasive ties to terrorism, unwavering dedication to al Qaeda's terrorist agenda, and extensive use of organizations under his control to support al Qaeda and affiliated terrorist organizations.

185.    For example, Suleiman al Rajhi established, founded, financed, and was the namesake of the SAAR network of "charities" and front groups organized at 555 Grove Street in Herndon, Virginia.  Until its dissolution, the SAAR Network was comprised of over 100 entities at this single address, with overlapping officers and directors set up to launder money to al Qaeda and international terrorism.  According to the Department of Defense, "the SAAR

network includes more than 100 Muslim think tanks, charities and companies.  The al-Rajhi family utilized SAAR to fund Islamic extremist organizations and has ties to al Qaida."

186.    In March 2002, the entities comprising the SAAR network were raided under a federal search warrant by the U.S. Treasury Department.  Known as Operation Green Quest, federal authorities were looking for "potential money laundering and tax evasion activities and their ties to terrorist groups such as . . . al Qaeda as well as individual terrorists . . . (including Osama bin Laden)."  Authorities said that the probe of the Herndon groups was the largest federal investigation of terrorism financing in the world.  An affidavit from Homeland Security agent David Kane said that the SAAR network in Herndon had sent more than $26 million in untraceable money overseas and that the leaders of the organization "have committed and conspired to . . . provide material support to foreign terrorist organizations."

187.    Suleiman al Rajhi also was a member of the board of directors of Akida Bank in the Bahamas, a Specially Designated Global Terrorist ("SDGT") entity pursuant to Executive Order 13224.  Akida Bank was run by Youssef Nada, a noted terrorist financier, with whom Suleiman al Rajhi had a close and longstanding relationship.

188.    Suleiman al Rajhi also enjoyed a long and ongoing relationship with Ahmed Idris Nasreddin, yet another SDGT.  Nasreddin and Nada are both founders and directors of Bank al Taqwa, itself a SDGT that operated from the Bahamas.  According to the U.S. Treasury Department, "Usama bin Laden and his al-Qaida organization received financial assistance from Youssef Nada.  Al Taqwa provides investment advice and cash transfer mechanisms for al Qaida and other radical Islamic groups."

189.    Suleiman al Rajhi also managed the National Commercial Bank budget of the Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC").  In 1999, U.S. officials sent a

48

written request to the U.N. Peacekeeping Force in Pristina, Kosovo advising that officials of the SJRC were "associates of Osama bin Laden" and were using the SJRC to help bin Laden "move money and men to and from the Balkans."

190.    Suleiman al Rajhi and members of the al Rajhi family also used Al Rajhi Bank to transfer large sums to the Third World Relief Agency ("TWRA"), a purported charitable organization that became an integral component of al Qaeda's support infrastructure.  In particular, a U.N. sponsored audit of the TWRA's financial and administrative records uncovered two (2) transfers of money totaling $53,287.70 sent by "Sulaiman Al Rajhi" to the TWRA account in June and July of 1993, and three (3) transfers totaling $155,894.28 to the TWRA by "Saleh Alabdulaziz Alrajhi and Brothers" in 1993 and 1994.  The 9/11 Commission found that Osama bin Laden used the TWRA to covertly provide support for terrorist activities.

191.    In 2013 the United States Senate Permanent Subcommittee on Investigations issued a report entitled *U.S. Vulnerabilities to Money Laundering, Drugs, and Terrorist Financing*, in which it surveyed much of the foregoing evidence concerning Al Rajhi Bank's terrorist connections.  Succinctly describing the import of the various, independent sources of evidence and connections to terrorism, the report states:  "Taken together, the information – the Al Qaeda Golden Chain document, the 2002 search of Al Rajhi-related entities in Virginia, the 2003 CIA report, the 2005 al Haramain Foundation indictment and trial, the 2007 media reports, the 2010 refusal to provide bank documents in a terrorist-financing trial, and the multiple links to suspect banks and accountholders – present an unusual array of troubling allegations about a particular financial institution."

192.    As reflected by the above and confirmed by U.S. investigations, a broad spectrum of evidence demonstrates that Suleiman al Rajhi was not merely a critical individual donor to al

Qaeda, but an active architect and manager of al Qaeda's global financial and logistical support network, who, along with others, actively deployed Al Rajhi Bank's resources to advance al Qaeda's continuous efforts to attack the United States.  The support and services Al Rajhi Bank provided to al Qaeda were essential to the development and maintenance of the infrastructure employed by al Qaeda to carry out the September 11th attacks, and designed to assist al Qaeda in attacking the United States.

## NATIONAL COMMERCIAL BANK

193.    National Commercial Bank ("NCB") was established in 1950 by Salim bin Mahfouz, father of Khalid bin Mahfouz.

194.    With his father's death in 1996, Khalid bin Mahfouz became President and CEO of NCB, and its principal shareholder with control over more than 50% of the bank's capital. Khalid bin Mahfouz served as President and CEO of NCB until he was pushed out of that position by Saudi authorities in 1999.

195.    Khalid bin Mahfouz's support of terrorism through financial institutions under his control began years before al Qaeda's formation, and continued through the September 11th attacks.

196.    Throughout the 1980s and early 1990s, NCB was closely related to, and often worked in collaboration with, the Bank of Credit and Commerce International ("BCCI"), a banking institution in which Khalid bin Mahfouz held a substantial equitable interest and served as the CEO.

197.    Under Khalid bin Mahfouz, BCCI was directly implicated in supporting terrorism. Specifically, in the course of targeting BCCI for laundering drug money, the CIA discovered BCCI's extensive involvement in manipulating certain financial markets, arms trafficking, and supporting international terrorism.  A federal investigation into BCCI's operations further

revealed extensive involvement in corrupt practices, including money laundering, hiding assets, and the obstruction of a U.S. Senate investigation.

198.    The 1992 U.S. Senate Investigative Report on the so-called "BCCI affair" linked the bank under bin Mahfouz to financial funding of the Afghan war, and supporting terrorism. According to the Report:

> BCCI may have been moving money through the National Bank of Oman to fund the war in Afghanistan.  The bank's role began to surface in the mid-1980's (…).  This was confirmed in the Wall Street Journal of 23 October 1991 which quotes a member of the late General Zia's cabinet as saying 'It was Arab money that was pouring through BCCI.'  The Bank which carried the money on from Oman to Pakistan and into Afghanistan was National Bank of Oman, where BCCI owned 29%.

> **********

> In the course of targeting BCCI for laundering drug money, the CIA learned of BCCI's involvement in manipulating certain financial markets, in arms trafficking, and in supporting international terrorism, including handling the finances of Sabri Al-Bannah or Abu Nidal, and his terrorist organization.

> **********

> BCCI's support of terrorism and arms trafficking developed out of several factors.  First, as a principal financial institution for a number of Gulf sheikhdoms, with branches all over the world, it was a logical choice for terrorist organizations, who received payment at BCCI-London and other branches directly from Gulf-state patrons, and then transferred those funds wherever they wished without apparent scrutiny.  Secondly, BCCI's flexibility regarding the falsification of documentation was helpful for such activities.  Finally, to the extent that pragmatic considerations were not sufficient of themselves to recommend BCCI, the bank's pan-third world and pro-Islam ideology would have recommended it to Arab terrorist groups.

199.    As a result of the investigations, Khalid bin Mahfouz was indicted on charges of participation in a Scheme to Defraud in the First Degree in violation of New York Penal Law § 190.65, in connection with his acts and omissions relative to BCCI Holdings and certain related

entities.  Khalid bin Mahfouz paid over $200 million in fines to settle the matter and avoid prosecution.

200.    Nonetheless, Khalid bin Mahfouz continued to support terrorist causes, including al Qaeda in particular, through NCB and other entities under his control in the ensuing years.

201.    Testifying before Congress just weeks after the September 11th attacks, Vincent Cannistraro, the former Central Intelligence Agency Chief of Counterterrorism Operations, described NCB's relationship with Osama bin Laden as follows:

> How does the al-Qaeda organization fund its worldwide network of cells and affiliated groups?  Several businessmen in Saudi Arabia and in the Gulf contribute monies.  Many of these contributions are given out of a sense of Islamic solidarity.  But much of the money is paid as "protection" to avoid having the enterprises run by these men attacked.  There is little doubt that a financial conduit to bin Laden was handled through the National Commercial Bank, until the Saudi government finally arrested a number of persons and closed down the channel.  It was evident that several wealthy Saudis were funneling contributions to bin Laden through this mechanism.

202.    The use of NCB by wealthy Saudi businessmen to transfer large sums of money to al Qaeda was confirmed by Zacarias Moussaoui, a key member of the terror organization. Moussaoui, personally handpicked by Osama bin Laden to build an electronic database to record the identities of al Qaeda's financial donors, their contributions and the sources of those monies, provided sworn testimony that he personally reviewed and documented financial transactions benefiting al Qaeda involving NCB.

203.    For his own part, Khalid bin Mahfouz has acknowledged making a $270,000 contribution to Osama bin Laden in 1988, contemporaneous with the establishment of al Qaeda.

204.    In the years that followed, NCB's support for al Qaeda under Khalid bin Mahfouz would mirror that of Al Rajhi Bank.  Like Al Rajhi Bank, NCB served as one of al Qaeda's preferred banks for many years, providing financial services for many of al Qaeda's "charity"

fronts, including the Muslim World League ("MWL"), International Islamic Relief Organization ("IIRO"), World Assembly of Muslim Youth ("WAMY), Muwafaq Foundation (a/k/a Blessed Relief Foundation), Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC"), and Al Haramain Islamic Foundation, among others.

205.    Muwafaq Foundation played an especially prominent role in NCB's material sponsorship of al Qaeda, and its activities serve to underscore Khalid bin Mahfouz's centrality within the al Qaeda financial and logistical support infrastructure.

206.    Not long after making his $270,000 contribution to Osama bin Laden, Khalid bin Mahfouz founded the Muwafaq Foundation in 1991, personally choosing Yassin Abdullah Kadi to help him manage the organization's operations.  Al Kadi, an Executive Order 13224 Specially Designated Global Terrorist ("SDGT") from October 12, 2001 to November 26, 2014, was hired by bin Mahfouz to establish NCB's Islamic Banking Division.

207.    Abdulrahman bin Mahfouz, Khalid bin Mahfouz's son, has publicly stated that Khalid bin Mahfouz provided up to $30 million for Muwafaq's operations.  Kadi also made significant contributions to Muwafaq, from his personal fortune.

208.    In establishing the Muwafaq Foundation, bin Mahfouz and Kadi sought to create a platform for al Qaeda's global expansion and the advancement of al Qaeda's jihad against the United States.

209.    Consistent with their vision, bin Mahfouz and Kadi opened a Muwafaq branch in Sudan when al Qaeda established operations in that country in the early 1990s.  Around this same time, Kadi acknowledges having personally met with bin Laden in Sudan.

210.    For the next decade, the Muwafaq Foundation provided resources through offices located around the world to support al Qaeda's jihad against the United States.  Muwafaq served

as a front for laundering contributions from wealthy al Qaeda sympathizers, and permitted al

Qaeda fighters to use ostensible employment with Muwafaq as a vehicle for gaining access to

conflict regions, thereby allowing them to carry out terrorist activities on behalf of al Qaeda in

those areas.  Muwafaq funded al Qaeda training camps in Afghanistan and Bosnia, and directly

participated in al Qaeda operations.  In 2001, Muwafaq merged directly into al Qaeda.

211.    In a November 29, 2001 letter from David D. Aufhauser, Department of the

Treasury General Counsel, to Switzerland's M. Claude Nicati, Substitut du Procureur General,

Mr. Aufhauser provided details concerning the Muwafaq Foundation's role in providing cover

for members of al Qaeda and other terrorist organizations:

- A number of individuals employed by or otherwise associated with the Muwafaq Foundation have connections to various terrorist organizations.  Muhammad Ali Harrath, main activist of the Tunisian Islamic Front (TIF) in the United Kingdom, was associated with Muwafaq personnel in Bosnia and other TIF members worked at the Muwafaq Foundation.  Syrian citizen Mahmoud Mehdi, once a director of the Muwafaq Foundation in Pakistan, was a member of Al Qa'ida and the Al-Faran terrorist group responsible for the kidnapping of Westerners in Kashmir.

- The Muwafaq Foundation also provided support to HAMAS and the Abu Sayyaf Organization in the Philippines.

- Following the dissolution of MK [Makhtab al Khidamat] in early June 2001 and its absorption into Al-Qa'ida, a number of NGOs formerly associated with MK, including Muwafaq, also merged with Al-Qa'ida.

- From 1993, the head of the European offices of the Muwafaq Foundation was Ayadi Chafiq Bin Muhammad, who has been identified as Mr. Kadi's closest associate.  Ayadi Chafiq fought in Afghanistan in the 1980s and is known to be associated with the Tunisian Islamic Front (TIF) in Algeria and Nabil Ben Mohammad Salah Maklouf, its leader.  Mr. Chafiq was expelled from Tunisia because of his membership in the TIF.

- Mr. Kadi's actions and those of his Muwafaq Foundation and businesses fit this pattern and give rise to a reasonable basis to believe that they have facilitated terrorist activities.

212.    From the date of the Muwafaq Foundation's creation, NCB provided financial services and other support to facilitate Muwafaq's central role in advancing al Qaeda's jihad against the United States, serving as an efficient conduit for wealthy Saudi businessmen to transfer funds to al Qaeda.

213.    NCB's role in this process was confirmed by a German Internal Intelligence Service investigation of Muwafaq, which found that "one route [for the sponsorship of al Qaeda] was the transfer of large sums from the National Commercial Bank to Islamic (charities).  These included Muwafaq el Kheiriya and Islamic Relief [IIRO].  There are institutional links between Muwafaq and Usama bin Laden's network."

214.    INTERPOL intelligence reports filed of record by the U.S. government in legal proceedings in the United States District Court for the District of Columbia, in support of Kadi's continued designation pursuant to Executive Order 13224, include details of a single transaction in which NCB transferred $2 million to Dr. Salim Bin Mahfouz, an official of Muwafaq in Europe.  Dr. bin Mahfouz then transferred $500,000 to Chafiq Ayadi, the Specially Designated Global Terrorist Kadi appointed to head Muwafaq's European Operations at the suggestion of Wa'el Jelaidan, a founding member of al Qaeda.  Dr. bin Mahfouz transferred an additional $1.4 million to an apparent shell company in Florida, which he had formed with a senior official of Taibah International, another designated al Qaeda front.

215.    In media reports published by Reuters and USA Today in 1999, U.S. intelligence sources stated that an investigation of NCB conducted by Saudi government officials had uncovered that $3 million from five of Saudi Arabia's prominent business leaders' accounts was transferred to Muwafaq.

216.    From the date of the Muwafaq Foundation's establishment until its merger into al Qaeda, NCB maintained close and intimate organizational connections with Muwafaq.

217.    As indicated above, the Muwafaq Foundation was established by NCB's then chairman, Khalid bin Mahfouz, and the architect of NCB's Islamic banking division, Yassin Abdullah Kadi.

218.    In his Statement to the U.S. Treasury Department's Office of Foreign Assets Control, Kadi himself confirmed that he and bin Mahfouz jointly conceived Muwafaq when Kadi was working "with KBM for NCB."  Further explaining his role in NCB, Kadi has stated that "KBM [bin Mahfouz] turned to me to help in realizing this ambition ['to convert NCB from a bank which offered purely conventional banking services to one that could also offer Islamic banking products'].  To do this, we established a new department within NCB called the 'Islamic Banking Department.'"  Kadi has further explained that he was "a member of the Islamic Banking Services Committee, which was formed by the National Commercial Bank in July 1997 and on which I served until December 8, 2009.  This is a committee responsible for the strategic development of Islamic banking services which was chaired by the CEO of the NCB.  I served on this committee with other senior bank officials."

219.    By his own design, Khalid bin Mahfouz hand-picked designated terror financier Kadi, with whom he maintained a "close personal relationship," to oversee the establishment and operation of the Muwafaq Foundation and NCB's Islamic Banking division.

220.    Khalid bin Mahfouz similarly appointed several other senior NCB personnel to positions in the management structure of Muwafaq Foundation.  Abdulrahman bin Mahfouz served as a Board member and Trustee of Muwafaq, and simultaneously held numerous senior

positions in NCB, including:  Vice President; Deputy General Manager; Member of the Board of Directors; and Chairman of the Management Committee of NCB.

221.    Mohamed al Ali al Qari bin Eid ("al Gari") was a founding Board member of Muwafaq in the United States, and in collaboration with Yassin Abdullah Kadi, developed Islamic Finance at NCB.  Al Gari was also appointed as NCB's Sharia Board Advisor, giving him authority over the use and attribution of NCB's zakat funds.

222.    Throughout the time he was working for "NCB," Kadi was also responsible for the management and operations of the Muwafaq Foundation, along with Khalid bin Mahfouz, who also played an active role in directing Muwafaq's operations.

223.    Throughout the time he and bin Mahfouz were directing Muwafaq's operations, Kadi admits having close relationships with senior al Qaeda officials, including founding al Qaeda member and close bin Laden associate Wa'el Jelaidan, who held senior leadership positions in the IIRO and SJRC and played a central role in the terrorist activities of those al Qaeda charity front organizations.

224.    During the period that Jelaidan served as Director of the SJRC, Kadi acknowledges providing support to the SJRC through an Albanian company Kadi owned.  Kadi has stated that he has known Jelaidan as a family friend since the 1980's.

225.    In relation to the management and operation of the Muwafaq Foundation, Kadi acknowledges having consulted with Jelaidan, and appointed terrorist operatives to run Muwafaq offices on the basis of Jelaidan's recommendation.  In fact, Kadi has stated that he "was first introduced to [Specially Designated Global Terrorist] Chafiq Ayadi in Zagreb, Croatia, by Wa'el Juladain in or around 1992" and further "recommended Chafiq Ayadi for the management" of

the Muwafaq Foundation.  Kadi would hire Ayadi to head Muwafaq's European operations upon the recommendation of Jelaidan in 1992.

226.    Kadi has longstanding ties to many other senior terrorist operatives including Muhammad Salah, a high-level HAMAS operative and Specially Designated Global Terrorist under Executive Order 12947, and Dr. Abdul Latif Saleh, founder of the Albanian Islamic Jihad.

227.    As a result of its intensive investigation of Kadi, the United States concluded that his ties to senior members of al Qaeda and several affiliated terrorist organizations could not be viewed as a coincidence, but rather reflected Kadi's own central role in al Qaeda's financial network.  According to the 2001 U.S. Treasury Department's Evidentiary Memorandum in Support of the Designation of Yassin al Kadi Pursuant to Executive Order 13224:

> Yassin Al Qadi is an experienced and sophisticated businessman and financier.  He has operated companies, including investment vehicles and banks, in many corners of the world.  He is presumed to be capable of understanding his investments, his companies, and his charities, and of being responsible for the actions of those entities which he founds, funds and/or controls.
>
> Al Qadi's defense, however, to all the charges that he has supported terrorist through his provision of funds to Muwafaq and other entities he controls and the persons with ties to terrorists is that either there is no evidence that these entities and individuals have been involved in terrorism, or that to the extent that they were, this involvement was beyond his knowledge.
>
> There is, however, substantial and credible evidence that both Muwafaq as an entity, and many of the individuals charged with operating it and distributing its funds, were engaged in a longstanding pattern of supporting terrorist and extremist causes.  This evidence comes from both classified and unclassified sources.
>
> Al Qadi admits his longstanding and intimate association with SDGT Julaidan, SDGT Chafiq Ayadi, Dr. Abdul Latif Saleh, and Amir Mehdi.  The latter three individuals have been, according to the information available to OFAC arrested and/or deported from their countries of operation because of associations with terrorists, and Julaidan is a known close associate of Usama Bin Ladin.  Each

one of these individuals handled significant sums of money provided to him by Al Qadi.

It strains credulity that Al Qadi could have unintentionally found himself in a repeating cycle of hiring individuals based on his assessment of their character and that these individuals kept deceiving him about their intents on providing his funds to terrorists and extremists. These are individuals who Al Qadi had opportunity to personally observe over a period of years, and he gave them significant sums of money to handle on his behalf. Indeed, Al Qadi continues to refer to Julaidan and others as trustworthy and does not question their motives.

In making this determination no one element, no one contact, no one accusation of funding is taken as being determinative of the assessment that Al Qadi has been providing support to terrorists through his actions. [Redacted text] associated with Al Qadi that have connections with terrorism and dating over too long a time period, to give credence to a defense that all of the reports are in error. OFAC concludes that when considering the number of sources, the number of activities and length of time, the totality of the evidence, both classified and unclassified provides a reason to believe Yaseen Al Qadi has funded terrorist and extremist individuals and operations.

228.    The Treasury Department Evidentiary Memorandum provides further details

concerning Kadi's and Muwafaq's al Qaeda sponsorship and terrorist activities:

- Of these seven [Muwafaq] offices/operations:

- Sudan:  Closed by Kadi following publication of *Africa Confidential* article inking Muwafaq to 1995 attempt on President Mubarak, and ceased operations in 1996 at about the same time that Bin Ladin left Sudan.  Additionally A.L-QADI is quoted as saying the office provided assistance to "jihad activities."

- Pakistan:  Headed by Amir Mehdi, [REDACTED].  The Pakistan government on March 21, 1995 raided the office and Medhi was arrested on May 29, 1995.  The office shut shortly thereafter.

- Ethiopia:  Closed in 1995 by the Ethiopian government subsequent to the Africa Confidential report.

- Europe:  Headed by Chafiq Ayadi, who is designated as an SDGT and was a leader of the radical Tunisian Islamic Front.

- <u>Albania</u>:  Office was headed by Dr. Abdul Latif Saleh who founded the Albanian Islamic Jihad, and who was deported from Albania in 1999 for his links to terrorism.

- AL-QADI hired Chafiq Ayadi, an SDGT designated at the same time as AL-QADI on October 12 2001, to head Muwafaq's European operations upon the recommendation of Wa'el Julaidan in late 1992.

- Kadi states in his submissions that during the 1990 to 1991 time period he was working with Khalid Bin Mahfouz for National Commercial Bank, and that they developed a relationship of mutual trust and respect.  During this time period Bin Mahfouz told AL-QADI that he wanted to start charity [Muwafaq] in memory of his parents.

- According to press accounts, in 1998, the Saudi government audited the Jeddah-based National Commercial Bank and found that $3 million in bank funds was funneled improperly to Muwafaq (a.k.a Blessed Relief), which allegedly transferred the money to bin Laden.

- There is however substantial and credible evidence that both Muwafaq as an entity, and many of the individuals charged with operating it and distributing its funds, were engaged in a longstanding pattern of supporting terrorist and extremist causes.  This evidence comes from both classified and unclassified sources.

229.    Consistent with the foregoing findings, the United States designated Kadi as a "Specially Designated Global Terrorist" on October 12, 2001, describing him as "a Saudi businessman whose companies span the Middle East, Europe, North America and South Asia, [who] has been consistently identified as a financial supporter of Usama bin Laden and other known extremists for more than a decade."

230.    The United States government summarized its findings regarding the Muwafaq Foundation's terrorist activities in a filing supporting Kadi's continued designation as a terrorist sponsor and supporter pursuant to Executive Order 13224.  The United States explained that under Kadi's leadership Muwafaq served as "an al Qaeda front that receives funding from wealthy Saudi businessmen" and that there exists "substantial and credible evidence that both Muwafaq as an entity, and many of the individual charged with operating it and distributing its funds, were engaged in a long-standing pattern of supporting terrorist and extremist causes."

The government presented the following additional details of the Muwafaq Foundation's deep participation in al Qaeda's jihad:

- Kadi hired Amir Mehdi to be the local director of Muwafaq's operation in Pakistan in 1992. In 1995, the Pakistani Government raided the offices and arrested Mehdi after he had handled and distributed Muwafaq funds for over two years. A news organization reported that the arrest of Ramzi Yousef for the first World Trade Center bombing prompted the raid on the Muwafaq office in Islamabad.

- Muwafaq provided logistical support and financial support for Al-Gama'at Al-Islamiya, a mujahadin battalion in Bosnia. That organization was designated as an SDGT on October 31, 2001.

- Muwafaq transferred $500,000 to terrorist organizations in the Balkans in the mid-1990s.

- "[I]n the mid-1990s, Muwafaq was involved in providing financial support for terrorist activities of the mujaheddin, as well as arms trafficking from Albania to Bosnia. Some involvement in the financing of these activities had also been provided by Usama bin Ladin."

- "As of late 2001, . . . [Kadi] continued to finance various fundamentalist institutions and organizations in the Balkans after Muwafaq ceased operations there in 1996," including two entities that were designated as SDGTs in early 2002 – The Revival of Islamic Heritage Society's Pakistan and Afghanistan offices and the Bosnia-Herzegovina branch of the Al-Haramain Foundation.

231. The Muwafaq Foundation also features prominently in a 1996 Central Intelligence Agency Report concerning the involvement of Islamic NGO's in terrorist activities ("1996 CIA Report"), which notes that Muwafaq "helps fund the Egyptian Mujahedin battalion in Bosnia, according to foreign government service, and it also funds at least one training camp in Afghanistan."

232. Ayman Awad, a participant in the Bosnian jihad and former employee of the Muwafaq Foundation, confirmed during testimony before the International Criminal Tribunal for the Former Yugoslavia that Muwafaq assisted al Qaeda fighters in gaining entry into the Balkans to participate in the jihad. According to Awad: "I said that I worked for a humanitarian

organisation.  I joined the organisation, the Mowafaq foundation, thinking that they were organising training for soldiers in Bosnia and Herzegovina, for Bosniak soldiers in Bosnia and Herzegovina. I wanted to work as an interpreter and translator, and I also wished to participate in the fighting."

233.    In a June 17, 1996 interview with Osama bin Laden in Cairo, bin Laden expressed his support for "the Muwaffaq Society in Zagreb."

234.    As these facts demonstrate, Khalid bin Mahfouz and Yassin al Kadi established Muwafaq Foundation to serve as an extensive platform for supporting al Qaeda's efforts to attack the United States on a range of fronts, and operated the purported charity as an arm of al Qaeda itself.  And, they used NCB to deliver critical funding to Muwafaq Foundation for those purposes, until international terrorist investgations led the alleged charity to simply merge into al Qaeda itself.

235.    NCB similarly provided material support and resources to al Qaeda via the IIRO and SJRC.

236.    For instance, NCB provided funds and financial support to IIRO over a period of many years, including maintaining and servicing numerous accounts for IIRO.  NCB also donated its own funds to the organization.

237.    The investigation of NCB conducted in or around 1998 revealed that over a 10 year period, $74 million was funneled by NCB's Zakat Committee to the IIRO.

238.    The NCB investigation stated that direct donations were "received through those [NCB] facilities to the Red Crescent Saudi Committee, International Islamic Relief Organization and Muwafaq Foundation."

239.    The SJRC also received valuable financial services from NCB which allowed the organization to provide direct financial and logistical support to al Qaeda for several years leading up to the 9/11 attack.  Under the supervision of Suleiman Abdul Aziz al Rajhi, NCB also managed the budget of the SJRC.

240.    In addition to maintaining the SJRC's bank accounts, NCB actively promoted those accounts on behalf of the organization.  Advertisements running in multiple issues of the Muslim World League Journal in 2000 and 2001 openly solicited funds and directed donors to SJRC accounts managed by NCB and Al Rajhi Bank.

241.    NCB opened two "shared accounts" with Al Rajhi Bank (Special Joint account #22 and #33) for the IIRO as a member of the SJRC, thereby allowing the SJRC to serve as a conduit for funneling donations to al Qaeda fighters in Kosovo and Chechnya.

242.    Given their prominent roles within al Qaeda's financial infrastructure, active participation in facilitating the sponsorship of al Qaeda, and personal involvement in the creation of charity platforms to support al Qaeda's operations, NCB officials Khalid bin Mahfouz and Yassin Abdullah Kadi necessarily were aware through a variety of channels of the terrorist activities of the Muwafaq Foundation, IIRO, and SJRC at all relevant times.

243.    NCB was also placed on notice of the terrorist activities of the Muwafaq Foundation, IIRO and SJRC through media reports and widely publicized governmental investigations.

244.    As the Treasury Department's Evidentiary Memorandum in Support of the Designation of Yassin al Kadi Pursuant to Executive Order 13224 makes clear, the terrorist activities of the Muwafaq Foundation were the subject of numerous public reports prior to September 11, 2001, and several of Muwafaq's offices were closed by foreign governments

between 1995 and 1999.  Further, forced closures of the IIRO and Al Haramain offices in Kenya in 1998 were similarly reported by a number of media outlets when Kenyan officials banned those organizations for supporting terrorism.  Likewise, the IIRO's support for the Abu Sayyaf Group, al Qaeda's affiliate in the Philippines, was widely reported upon by the press during this same time frame.  Prominent media reports also documented the SJRC's role in facilitating the movement of "money and men to and from the Balkans" for Osama bin Laden.

245.    Collectively, the evidence documenting the intimate dealings among Khalid bin Mahfouz, Yassin al Kadi, NCB and numerous components and members of al Qaeda's core structure, including Osama bin Laden himself, firmly establish that NCB knowingly used its infrastructure and resources to advance al Qaeda's campaign to attack the United States, with the intent that the resources they provided to bin Laden would be used for that specific purpose.

### SAUDI BINLADIN GROUP

246.    Saudi Binladin Group, the family construction business operated and controlled by Osama bin Laden and his brothers, was an integral part of the al Qaeda network from the terrorist group's earliest days and provided assistance that was essential to establishing the network and capabilities that would ultimately carry out the September 11th attacks.

247.    Throughout the period of the "holy war" against the Soviet occupation of Afghanistan of the 1980s, the bin Laden family construction business supported Osama bin Laden and his jihadist activities with significant contributions of money and construction equipment, used to build the infrastructure for training and sheltering the mujahideen fighters.

248.    According to the 9/11 Commission's *Monograph on Terrorism Financing,* Osama bin Laden received about a million dollars per year in support from his family starting in 1970 – $20-25 million in all, and at least $5 million since the beginning of al Qaeda.

249.     Contemporaneous with the conclusion of the Afghan jihad and formation of al
Qaeda, the construction business founded in the 1930s by Osama bin Laden's father, Mohammed
bin Awad bin Laden, was reorganized into Saudi Binladin Group ("SBG").  Osama, together
with nineteen of his brothers, was one of the founding shareholders who controlled and operated
the closely held family business.  To this day, SBG is owned and operated by members of the bin
Laden family.

250.     Following the withdrawal of Soviet forces from Afghanistan, Osama bin Laden
returned to Saudi Arabia to work for SBG.  Between 1989 and 1991, while working for SBG,
Osama continued to establish the infrastructure for his al Qaeda network, including finding a
new haven to serve as a base of operations for al Qaeda.

251.     Despite the active support of the Arab countries, in particular Saudi Arabia which
funded and transported the Arab *mujahideen*, at the conclusion of the war neither Saudi Arabia
nor other Arab countries wanted to host these ideologically trained killers.  Pakistan, the front-
line state which had hosted the mujahideen during the war in Afghanistan was also anxious to get
rid of the Arab fighters.

252.     Osama bin Laden ultimately found the safe haven he was seeking when, in 1989,
just as the Afghan jihad was ending, radical Muslim Brotherhood leader Hassan al Turabi led a
*coup d'état* and seized power in Sudan.  According to the 9/11 Commission, one of his first acts
was to send emissaries to Osama bin Laden with an offer for him to relocate his new group, al
Qaeda, to Sudan, "in an ongoing war against African Christian separatists in southern Sudan and
also to do some road building.  Turabi and the National Islamic Front in return would let bin
Laden use Sudan as a base for worldwide business operations and for preparations for jihad."

*See* 9/11 Commission Report at p. 57.  Bin Laden was in a perfect position to make this *quid pro quo* arrangement because of his role coordinating the activities of SBG and al Qaeda.

253.    Osama bin Laden accepted Turabi's invitation and began moving his terror organization to Sudan in 1991.  While in Sudan, bin Laden established numerous businesses to provide income for al Qaeda's operations.  These business ventures included:  Wadi al-Aqiq Company, Ltd, a holding firm; Ladin International Company, an import/export business; Taba Investment Company, Ltd., a currency trading firm; al-Hijrah for Construction and Development, a construction enterprise which performed several significant infrastructure projects on behalf of the ruling National Islamic Front; and the Themar al Mubaraka Company, an agricultural business.

254.    Throughout the early 1990s, the agreement went as planned:  Osama bin Laden enjoyed a refuge for building up and training al Qaeda, including the launch of attacks against U.S. military forces en route to Somalia in 1992.  Meanwhile, SBG, with Osama's personal oversight helped arrange infrastructure projects for the Turabi regime, including the construction of a new airport in Port Sudan and a major road linking Khartoum to the northern part of the country.

255.    One of the first major contracts SBG undertook, if not the first, was a major contract awarded by the Turabi regime to its "Binladin Overseas" affiliate for the construction of the airport in Port Sudan.

256.    The airport construction project took place between February 1990 and mid-1992, the exact period of time in which al Qaeda was relocating from Afghanistan/Pakistan to Sudan.  Osama bin Laden, still a SBG principal at the time, had an oversight role with the Port Sudan airport project.

257.    According to affidavit testimony provided by Musa Dawoud Musa Mustafa, the

SBG Project Manager responsible for executing and constructing the Port Sudan airport, Osama

bin Laden visited the Port Sudan construction site accompanied by Sudanese government

officials while he served as a shareholder and director of SBG.

258.    Turabi himself confirmed Osama bin Laden's involvement in the Port Sudan

Airport project in a 1998 interview with the Arabic-language MBC TV:

> For those who know nothing about Saudi Arabia, Bin Laden has the
> biggest family and construction company that builds roads and
> institutions**.**  *He came to Sudan as a branch of this company.  He
> built the road linking Khartoum to the north, which could have been
> extended to reach Port Sudan.  He also built the Port Sudan
> airport.*  He stayed away from the social life in Sudan.  He also set
> up an agriculture project in Sudan.  He was a struggler, and he had
> full US and Arab backing when he was struggling in
> Afghanistan.  After that, he was not expelled from Sudan by the
> Sudanese and did not leave because he hated Sudan.  He just did not
> want to cause an embarrassment in the relations with Saudi Arabia,
> which stripped him of his nationality.

259.    Osama bin Laden's continuing financial support from SBG and continuing

business ties on the various construction projects they were pursuing helped strengthen Osama's

ties with his hosts from the National Islamic Front.

260.    Indeed, while SBG and Osama bin Laden were performing lucrative construction

work in Sudan, a period during which Osama remained an SBG shareholder and director, Sudan

was that safe haven in which Osama could grow al Qaeda from a small jihadist army to what the

9/11 Commission Report deemed "a true global terrorist network."  *See* 9/11 Commission Report

at p. 58.

261.    During his refuge in Sudan, SBG and the bin Laden family continued to facilitate

financial transfers to Osama bin Laden.  For instance, on October 28, 1991, the family

transferred $482,034.37 (Osama's original deposit, plus accrued interest, less banking fees) to his

half-brother Haider for Osama's use, and "there is no indication it was withheld from Osama."

*See* Steven Coll, *The Bin Ladens*, at p. 383.  In total, bin Laden received at least $5 million in

distributions from SBG following the formation of al Qaeda until SBG *allegedly* severed ties

with Osama bin Laden.

262.    According to the 9/11 Commission Report, Osama bin Laden used his time in

Sudan, while still an SBG principal, to build his terrorist army:

> Bin Ladin moved to Sudan in 1991 and set up a large and complex
> set of intertwined business and terrorist enterprises. In time, the
> former would encompass numerous companies and a global
> network of bank accounts and nongovernmental institutions.
> Fulfilling his bargain with Turabi, Bin Ladin used his construction
> company to build a new highway from Khartoum to Port Sudan on
> the Red Sea coast. Meanwhile, al Qaeda finance officers and top
> operatives used their positions in Bin Ladin's businesses to acquire
> weapons, explosives, and technical equipment for terrorist
> purposes. One founding member, Abu Hajer al Iraqi, used his
> position as head of a Bin Ladin investment company to carry out
> procurement trips from Western Europe to the Far East. Two
> others, Wadi al Hage and Mubarak Douri, who had become
> acquainted in Tucson, Arizona, in the late 1980s, went as far afield
> as China, Malaysia, the Philippines, and the former Soviet states of
> Ukraine and Belarus.
>
> Bin Ladin's impressive array of offices covertly provided financial
> and other support for terrorist activities. The network included a
> major business enterprise in Cyprus; a "services" branch in
> Zagreb; an office of the Benevolence International Foundation in
> Sarajevo, which supported the Bosnian Muslims in their conflict
> with Serbia and Croatia; and an NGO in Baku, Azerbaijan, that
> was employed as well by Egyptian Islamic Jihad both as a source
> and conduit for finances and as a support center for the Muslim
> rebels in Chechnya. He also made use of the already-established
> Third World Relief Agency (TWRA) headquartered in Vienna,
> whose branch office locations included Zagreb and Budapest. (Bin
> Ladin later set up an NGO in Nairobi as a cover for operatives
> there.)
>
> Bin Ladin now had a vision of himself as head of an international
> jihad confederation. In Sudan, he established an "Islamic Army
> Shura" that was to serve as the coordinating body for the
> consortium of terrorist groups with which he was forging alliances.

It was composed of his own al Qaeda Shura together with leaders or representatives of terrorist organizations that were still independent. In building this Islamic army, he enlisted groups from Saudi Arabia, Egypt, Jordan, Lebanon, Iraq, Oman, Algeria, Libya, Tunisia, Morocco, Somalia, and Eritrea. Al Qaeda also established cooperative but less formal relationships with other extremist groups from these same countries; from the African states of Chad, Mali, Niger, Nigeria, and Uganda; and from the Southeast Asian states of Burma, Thailand, Malaysia, and Indonesia. Bin Ladin maintained connections in the Bosnian conflict as well. The groundwork for a true global terrorist network was being laid.

Bin Ladin also provided equipment and training assistance to the Moro Islamic Liberation Front in the Philippines and also to a newly forming Philippine group that called itself the Abu Sayyaf Brigade, after one of the major Afghan jihadist commanders. Al Qaeda helped Jemaah Islamiya (JI), a nascent organization headed by Indonesian Islamists with cells scattered across Malaysia, Singapore, Indonesia, and the Philippines. It also aided a Pakistani group engaged in insurrectionist attacks in Kashmir. In mid-1991, Bin Ladin dispatched a band of supporters to the northern Afghanistan border to assist the Tajikistan Islamists in the ethnic conflicts that had been boiling there even before the Central Asian departments of the Soviet Union became independent states.

This pattern of expansion through building alliances extended to the United States. A Muslim organization called al Khifa had numerous branch offices, the largest of which was in the Farouq mosque in Brooklyn. In the mid 1980s, it had been set up as one of the first outposts of Azzam and Bin Ladin's MAK. Other cities with branches of al Khifa included Atlanta, Boston, Chicago, Pittsburgh, and Tucson. Al Khifa recruited American Muslims to fight in Afghanistan; some of them would participate in terrorist actions in the United States in the early 1990s and in al Qaeda operations elsewhere, including the 1998 attacks on U.S. embassies in East Africa.

*See* 9/11 Commission Report at pp. 57-58.

263.    Osama bin Laden's terrorist agenda directed at harming the United States was no secret to the other principals within SBG or his family during this period.  In fact, bin Laden's hatred for the United States was longstanding, dating to the U.S.'s role in the 1982 war between Israel and Lebanon when U.S. warships protected the Israelis invading Lebanon.  "As I looked at

those demolished towers in Lebanon," bin Laden would later recall, "it entered my mind that we should punish the oppressor in kind and that we should destroy towers in America in order that they taste some of what we tasted." *See* Lawrence Wright, *The Looming Tower*, at p. 151.

264.    Given their familial relationship and the family's role in supporting Osama bin Laden during the Afghan jihad, it is beyond any reasonable doubt that Osama's family members were aware of his plans to carry out jihad against the United States from the time of al Qaeda's formation in 1988, and they were certainly aware of his intentions to attack America by 1990 given Osama's pronouncement at the family's own Jeddah mosque (telling an audience of hundreds that "[t]he Americans won't stop their support of Jews in Palestine until we give them a lot of blows.  They won't stop until we do jihad against them."), and his personal investment in the creation of an Islamic army.

265.    Shortly thereafter, Iraq invaded Kuwait and Osama bin Laden sent a message to the Saudi Royal Family, offering to form and lead an army of 30,000 Afghan war veterans to expel Saddam Hussein from Kuwait.  His offer was firmly rejected and U.S. troops were stationed in Saudi Arabia.  This action, more than anything else, is what prompted Osama bin Laden's animus towards the Saudi rulers and further compelled him and other senior al Qaeda leadership to issue a formal *fatwa* in 1992 specifically calling for jihad against the United States and other Western allies.  As the 9/11 Commission Report concluded:

> In August 1990, Iraq invaded Kuwait. Bin Ladin, whose efforts in Afghanistan had earned him celebrity and respect, proposed to the Saudi monarchy that he summon mujahideen for a jihad to retake Kuwait. He was rebuffed, and the Saudis joined the U.S.-led coalition. After the Saudis agreed to allow U.S. armed forces to be based in the Kingdom, Bin Ladin and a number of Islamic clerics began to publicly denounce the arrangement. The Saudi government exiled the clerics and undertook to silence Bin Ladin by, among other things, taking away his passport....

> Bin Ladin began delivering diatribes against the United States
> before he left Saudi Arabia. He continued to do so after he arrived
> in Sudan. In early 1992, the al Qaeda leadership issued a fatwa
> calling for jihad against the Western "occupation" of Islamic lands.
> Specifically singling out U.S. forces for attack, the language
> resembled that which would appear in Bin Ladin's public fatwa in
> August 1996. In ensuing weeks, Bin Ladin delivered an often-
> repeated lecture on the need to cut off "the head of the snake."

*See* 9/11 Commission Report at pp. 57, 59.

266.    The 9/11 Commission Report further noted, "Though novel for its open

endorsement of indiscriminate killing, Bin Ladin's 1998 declaration was only the latest in the

long series of his public and private calls since 1992 that singled out the United States for

attack." *See* 9/11 Commission Report at p. 48.

267.    With the issuance of the 1992 *fatwa*, SBG and others were fully aware that any

support provided to Osama bin Laden would inevitably support a violent attack against the

United States.

268.    True to his word, in December 1992, Osama bin Laden struck his first violent

blow against the U.S. with the attempted bombing of U.S. military personnel staying in a hotel in

Aden, Yemen, where U.S. troops often stayed en route to Somalia.

269.    U.S. intelligence was confident of Osama bin Laden's role in the attack. As the

Congressional Joint Inquiry into Intelligence Community Activities before and after the Terrorist

Attacks of September 11, 2001 noted:

> In December 1992, as U.S. military forces were deploying to
> Somalia as part of a United Nations operation to provide
> humanitarian assistance to a starving population, Islamic
> extremists attacked a hotel in Aden, Yemen housing U.S. service
> members supporting that operation. *An Intelligence Community
> paper from April 1993 concluded that "[Bin Ladin's] group
> almost certainly played a role" in that attack.* An article from an
> April 1993 National Intelligence Daily also took note that three to
> four hundred Islamic militants had received training the previous
> year at military camps in Afghanistan funded by Persian Gulf

Arabs.  One camp was run by an Egyptian and funded by Bin
Ladin.

270.    By early 1993, Osama bin Laden's terrorist activities were so well known that

U.S. and global news media were reporting that al Qaeda was targeting the United States.

According to Chris Hedges, "*Muslim Militants Share Afghan Link*," The New York Times

(March 28, 1993):

> Yemeni officials contend that Afghanistan veterans in Yemen,
> financed by Osama Binladen, a wealthy Saudi militant and former
> Afghan guerrilla now living in Khartoum, Sudan, have been
> behind a series of attacks, including two bombs in Aden hotels last
> year that killed an Australian tourist.

271.    Not only was he attacking American interests in Yemen, but as the 9/11

Commission Report found, in nearby Somalia as well:

> After U.S. troops deployed to Somalia in late 1992, al Qaeda
> leaders formulated a fatwa demanding their eviction.  In
> December, bombs exploded at two hotels in Aden where U.S.
> troops routinely stopped en route to Somalia, killing two, but no
> Americans.  The perpetrators are reported to have belonged to a
> group from southern Yemen headed by a Yemeni member of Bin
> Ladin's Islamic Army Shura; some in the group had trained at an al
> Qaeda camp in Sudan.
>
> Al Qaeda leaders set up a Nairobi cell and used it to send weapons
> and trainers to the Somali warlords battling U.S. forces, an
> operation directly supervised by al Qaeda's military leader.  Scores
> of trainers flowed to Somalia over the ensuing months, including
> most of the senior members and weapons training experts of al
> Qaeda's military committee.  These trainers were later heard
> boasting that their assistance led to the October 1993 shoot down
> of two U.S. Black Hawk helicopters by members of a Somali
> militia group and to the subsequent withdrawal of U.S. forces in
> early 1994.

*See* 9/11 Commission Report at pp. 59-60.

272.    As former al Qaeda member Jamal al Fadl testified in 2001 at the U.S Embassy

bombing trial, Osama bin Laden told his al Qaeda comrades in late 1993 that the American army

72

had come to the Horn of Africa, "and we have to stop the head of the snake. .... He said that the snake is America, and we have to stop them. We have to cut the head and stop them."

273.    Moreover, given the generations of strong ties between the Bin Ladens and the Saudi Royal Family, dating back decades to the billions of dollars' worth of construction work that SBG's predecessor organization did on behalf of the Saudi Kingdom including the royal palace and expansion of the holy places in Mecca, it is beyond any reasonable doubt that whatever Saudi intelligence further learned about Osama's jihadist's ambitions was shared with bin Laden family members in conjunction with their efforts to persuade him to return to the Kingdom.

274.    Indeed, former Saudi Intelligence Director Prince Turki al Faisal al Saud made clear in a February 2006 event with the Council on Foreign Relations that they were "aware" of Osama's role as the head of an Islamic jihadist army no later than 1989:

>   I met Osama bin Laden five times in my life as intelligence
>   director. Mid-'80s to end of 1989 or beginning of 1990 was the last
>   time I saw him. And when the withdrawal of Soviet troops in
>   Afghanistan occurred, bin Laden and his supporters within
>   Afghanistan—and by the way, that's where al Qaeda was born. As
>   I like to—prefer to say, the al Qaeda was born in the hills of
>   Afghanistan rather than in the deserts of Saudi Arabia. And they
>   decided that they were going to form a group that will, in their
>   view, protect Muslim interests throughout the world as they
>   identified themselves as being the primary claimants to the credit
>   of driving the Soviets out of Afghanistan.
>
>   And so, by 1990 when I last saw him at the beginning of that year,
>   he had come to me with a proposition that he wants to bring his
>   Mujahedeen as he called them, to liberate the then-Marxist regime
>   in south Yemen. And I advised him that that was not the right time
>   to do it because there were other factors playing there politically
>   and economically. South Yemen was being—not a favorite word
>   of mine—weaned away from the Soviet Union at that time. So, he
>   left and that was the last that I saw of him.
>
>   He then remained in the kingdom for another two years after that,
>   sometimes going to mosques and preaching without taking

permission to do so and being arrested for doing that and reprimanded and then let go.

And I think at the end of 1992—perhaps Mr. Rubin can correct me on that—he asked for permission to leave Saudi Arabia. And he left and went to Afghanistan. And he went from there in—end of 1993 he went to the Sudan, and that's when he began operating against the kingdom from the Sudan. He was stripped of his Saudi citizenship in 1994. His financial assets were frozen at that time and even his personal family disowned him in public at that time.

By 1996, he moved from the Sudan to Afghanistan and it went on from there. *So we were pretty much aware of bin Laden from the very beginning, if you like.* Not perhaps so much in terms of how dangerous he could be, but as he grew and as his movement grew, people became more aware of his danger.

*See* "*A Conversation with Prince Turki al-Faisal*," Council on Foreign Relations (February 13, 2006).

275.    As the chairman of SBG and bin Laden family leader, Bakr bin Laden maintained close relationships with the most senior representatives of the Kingdom, including the King himself:

Apart from Osama, the primary source of concern in Bakr's world seemed to be his relationship with the al-Saud… Bakr would leap to open the door deferentially for even a minor royal.  He seemed to worry chronically about the disposition of the major Al-Saud on whom his business relied – Crown Prince Abdullah, of course, but also Prince Salman, the governor of Riyadh, and Abdulaziz bin Fahd, the son of the disabled king.

*See* Steven Coll, *The Bin Ladens*, at p. 500:

276.    Given the problems which Osama bin Laden's activities presented to SBG's business interests, the company itself had strong reason to closely monitor Osama's activities and statements at all times.  As a result, SBG was uniquely aware of Osama bin Laden's jihadist activities from the earliest date.

277.    Any support SBG provided Osama bin Laden from 1988 onwards, and certainly by 1990, was done with the awareness that it was for the benefit of Osama's plans for terrorist strikes against America.

278.    Nevertheless, the bin Laden family members and principals of SBG continued to knowingly provide significant support to Osama bin Laden in furtherance of his jihadist activities.

279.    SBG's controlling shareholders had intimate knowledge of al Qaeda's objectives, coordinated closely with al Qaeda leadership, and provided extensive support to al Qaeda with the intent of furthering its objectives and harming the United States.  They did so in part through their actions undertaken through SBG.

280.    For instance, SBG provided cover for Mohammed Jamal Khalifa, a founding member of al Qaeda operative and Osama bin Laden's brother-in-law.  The Mohammed Binladin Company ("MBC"), which SBG concedes is part of its same corporate structure, sponsored Khalifa's visa application to the United States.  Khalifa, who was appointed to head the Philippines branch office of the International Islamic Relief Organization ("IIRO") following his participation in the Afghan jihad, used the IIRO as a platform for al Qaeda's expansion into Southeast Asia and personally orchestrated IIRO's funding and support for the Abu Sayyaf Group and other terrorist organizations in the region.

281.    As Osama bin Laden's role in anti-American terrorism was becoming more widely known abroad, SBG began to take steps to erase the formal ties between Osama bin Laden and the family-owned company.

282.    The 9/11 Commission's staff *Monograph on Terrorist Financing* noted that these steps here were not undertaken by SBG voluntarily, but rather only occurred because the government compelled SBG to take some public action:

> From about 1970 until 1993 or 1994, Usama Bin Ladin received about a million dollars per year—adding up to a significant sum, to be sure, but not a $300 million fortune. In 1994 *the Saudi government forced the Bin Ladin family to find a buyer for Osama's share of the family company and to place the proceeds into a frozen account.*

283.    SBG claimed that it had severed financial ties with Osama bin Laden in 1993, prior to any inkling that Osama harbored anti-American sentiment, and that such severance was complete, totally and effective by 1993.  However, strong evidence suggests SBG's continued links and support to Osama and al Qaeda persisted.

284.    In fact, SBG directors and Bin Laden family members kept a financial lifeline open to Osama throughout the decade leading into the September 11th attacks.

285.    In addition to SBG itself, the Mohammed Binladin Organization ("MBO") was a loosely organized set of businesses established by Mohammed bin Awad bin Laden, father of Osama, Bakr, and the other SBG principals.  Following Mohammed's sudden death in 1967, King Faisal appointed trustees to oversee the organization.

286.    By 1988, many of Mohammed's sons had taken on managerial roles within the organization.  Bakr bin Laden, a senior brother in the family, began the process of reorganization of the businesses.   According to SBG, "In 1989, as part of the natural progression in the growth of the company, various autonomous divisions were created under the umbrella of the Saudi Binladin Group (SBG)."  *See* http://web.archive.org/web/20010814095646/www.saudi-binladin-group.com/history.htm.

287.    Again, SBG had twenty founding shareholders.  All were sons of Mohammed bin Laden, including Osama.

288.     One of the companies put under the umbrella of SBG was the Mohammed Binladin Company ("MBC"), whose shareholders included all the sons, daughters and wives of Mohammed bin Laden.  Osama had shares in MBC as well as SBG.

289.     Bakr bin Laden initiated action against Osama at a January 1993 MBC board meeting to prohibit payment to Osama of his share of their profits.  As Chairman of SBG, Bakr allegedly instructed SBG to do the same.

290.     In June 1993, shortly after U.S. intelligence had concluded that Osama bin Laden was behind the Yemen attack and the New York Times published similar claims, SBG claims that both it and MBC passed resolutions divesting Osama of his ownership of the shares.  Osama's "divested" shares in the company were transferred solely to his brother and SBG shareholder Ghaleb bin Laden, who had previously supported Osama during the Afghan mujahedeen campaign.  The corporate resolutions state that the actions were taken at the request of Osama, and that Osama himself designated Ghaleb as the recipient of his stake.

291.     Ghaleb reportedly delivered as much as $50,000 in cash directly to Osama in Afghanistan during the battle for Jalalabad in April 1989.

292.     The SBG resolution itself does not reflect an involuntary divestment of one already shunned by the family; it states that Osama was "represented by his lawful attorney" who "wishes" and "desired" to assign his shares to his brother Ghaleb, who did not pay for them.

293.     Bakr bin Laden has represented in sworn affidavit testimony that the value of Osama bin Laden's shares was placed in a trust outside of his brother's control in 1993, and that he strictly prohibited family members and individuals associated with the bin Laden companies from providing financial or other support to Osama.  *See* Affidavit of Bakr Binladin, Case No. 1:03-md-1570 (ECF No. 2286, September 7, 2010) at ¶ 8 (stating "the money was placed in a trust outside of Osama's control" and "[m]y family took these actions in June 1993"); ¶ 10

("Osama has not received a penny from MBC or SBG or any of their affiliates since, at the latest, June 1993.  Nor has Osama received any other form of support from MBC, SBG or any of their affiliates since that time.  I have not authorized and, indeed, have forbidden any person acting on behalf of MBC, SBG or any of their affiliates to make any payments, do any business with, or otherwise provide any support directly or indirectly to Osama or any of his companies since June 1993.").

294.    However, the value of those shares was not placed in trust until April 2000, 7 years later, when Ghaleb deposited $9.8 million into an account at NCB.

295.    Critically, the $9.8 million deposited in 2000 represented only the value of the shares in 1993, not the distributions related to the shares over the intervening seven years.  Those distributions remained unaccounted for.

296.    This discrepancy becomes even more significant when coupled with the fact that over that same period Ghaleb was formally entitled to the benefits of holding Osama's shares, he and his brother Bakr bin Laden, using SBG's business address, invested substantial sums in Bank al Taqwa from November 1993 until March 2000.  Shortly after 9/11, Bank al Taqwa was named by the U.S. Treasury Department as a terrorist entity for its activities in support of al Qaeda since the 1980s.

297.    In a January 4, 2002 letter from U.S. Department of the Treasury Deputy General Counsel George B. Wolfe to Claude Nicati, Substitut du Procureur General of Switzerland, some of Bank al Taqwa's activities were "providing indirect investment services for Al Qa'ida, investing funds for bin Laden, and making cash deliveries on request to the Al Qa'ida organization."

298.    These allegations are consistent with the indirect investment of Osama bin Laden's funds in Bank al Taqwa by SBG.

299.    Contrary to the bin Laden's family's public repudiation of Osama bin Laden, Osama's own words confirm that there was a continuing financing mechanism to him and al Qaeda orchestrated by Bakr bin Laden and SBG, and that the terms of that financial arrangement remained in effect for many years.  In March 2016, the U.S. government declassified a tranche of documents that had been recovered during the raid on Osama bin Laden's compound in Abbottabad, Pakistan.  Included in that tranche was a "will" personally written by Osama bin Laden in which he states that he has approximately $29 million in Sudan, and "out of this amount, 12 million dollars came from my brother, Bakr bin Muhammad Bin Laden, on behalf of Bin Laden Company, for their investment in Sudan."  U.S. intelligence believes the will was written in the late 1990's.

300.    Osama's will also directs that the funds should be returned to his family members under terms set forth in the will, and bin Laden further urges his family members to spend the remainder of the money on holy war, suggesting that Osama's siblings and relatives remained supportive of his jihadist agenda:  "I hope for my brothers, sisters and maternal aunts to obey my will and to spend all the money that I have left in Sudan on jihad, for the sake of Allah."

301.    Beyond the material support, SBG principals maintained contact with Osama bin Laden via personal visits, letters, telephone calls, and via intermediaries during the years he took refuge in Sudan and Afghanistan.

302.    SBG principals Omar bin Laden and Ghaleb bin Laden both were in phone contact with Osama after this disaffiliation – Omar in 1995, and Ghaleb repeatedly in 1998 in advance of the U.S. Embassy bombings.

303.     Moreover, Osama's written contact with SBG principals was pervasive and certainly not antagonistic.  The tone of both letters is friendly not bitter, and the dispute between them seems closer to an oversight or clerical error than of a bitter struggle over an inheritance or the waging of battle over divvying up of corporate assets.

304.     Consistent with this evidence that Osama bin Laden retained the support of his family long after they claimed to have disowned him, Michael Scheuer, the Chief of the CIA's Bin Laden Unit from 1996 through 1999, has stated that "There is no solid evidence to suggest that [Osama] bin Laden ever found anything but warmth and acceptance from the family." Scheuer has cast doubt on the claims by Bakr bin Laden and other family members that the family disavowed Osama bin Laden and withheld his share of the profits from SBG.  On this point, Scheuer cites the following statement of Sa'd al-Faqih, one of bin Laden's colleagues in the Islamic Awakening movement in Saudi Arabia in the early 1990s:

> There is a very interesting thing in the structure of [the Islamic] family.  You are obligated to support your famiy members….
> Well, [the bin Ladens] have to say that [that they disowned Osama].  They have to pretend to be cutting off bin Laden.  But in all actuality they admire him, they respect him…I do not claim that all…the bin Laden brothers do.  But quite a significant number of them work hard to get [rid of] what they see as singufl money – which has to reach the rightful owner.

305.     In line with Scheuer's assessments and al-Faqih's observations, Zacarias Moussaoui testified on the basis of his personal dealings with Osama bin Laden that Osama bin Laden continued to maintain strong ties to his family and enjoy the support of his family and SBG long after al Qaeda relocated from Sudan to Afghanistan.  According to Moussaoui, who was resident in al Qaeda's operational base in Kandahar, Afghanistan and in direct contact with Osama bin Laden between 1998-2000, Osama regularly welcomed bin Laden family members visiting from Saudi Arabia in Afghanistan.  When Osama's mother visited her son in

Afghanistan, Moussaoui described it as a "significant event," "a festivity" marked by the shooting of weapons such as rocket propelled grenades (RPG) and machine guns.

306.    Moussaoui further testified that SBG assisted al Qaeda in building the camps where the 9/11 hijackers received training by covertly shipping construction parts to Pakistan in the late 1990s, where it was received by al Qaeda members and later transported to Afghanistan.

307.    When told that SBG had made several representations in court proceedings that the bin Laden family and SBG had severed all ties with Osama in 1994, Moussaoui called it a "complete lie" and "absolute lie."

308.    Part Four of the *Report of the Congressional Joint Inquiry Into the Terrorist Attacks of September 11, 2001,* commonly referred to as the so-called "28 Pages," additionally affirms that bin Laden family members maintained ties with al Qaeda and Osama bin Laden well beyond the point in time that they claim to have severed all such ties.  In this regard, the report indicates that "an extremist and supporter of Usama bin Ladin" named Osama Bassnan "knew bin Ladin's family in Saudi Arabia" and was in telephone contact with "members of the family who are living in the United States."  These statements align with Moussaoui's testimony that bin Laden family members in the United States and elsewhere were in contact with al Qaeda operatives, and involved in providing support to al Qaeda throughout the 1990s.

309.    The 28 Pages also discloses an FBI finding that an individual named Fahad Abdullah Saleh Bakala was responsible for "flying Usama bin Ladin between Afghanistan and Saudi Arabia during UBL's exile," a fact that discloses another means through which bin Laden may have been maintaining contact with his family during that period.

310.    Osama bin Laden left Sudan in 1996 under international pressure and returned to Afghanistan.  By that point, he had launched al Qaeda as a sophisticated global terrorist network.

It was well on its way to further attacks on the United States, including the 1998 bombing of American embassies in Kenya and Tanzania, the 2000 bombing of the U.S.S. Cole, and ultimately the September 11th attacks.  None of this would have been possible without SBG's close coordination and support, including its arrangements with the Sudanese government that guaranteed a safe haven for al-Qaeda, direct financial support to Osama bin Laden during his time in Sudan, and continued financial lifelines after his departure.

## COUNT I

### AIDING AND ABETTING AND CONSPIRING WITH AL QAEDA TO COMMIT THE SEPTEMBER 11th ATTACKS UPON THE UNITED STATES IN VIOLATION OF 18 U.S.C. § 2333(d) (JASTA)

311.    Plaintiffs incorporate all previous allegations by reference.

312.    For purposes of the claims asserted herein under the Anti-Terrorism Act ("ATA"), plaintiffs are either themselves nationals of the United States who suffered injury to their business or property as a result of the September 11th attacks for which they seek recovery under the ATA, and/or made payments in compensation for injuries to person, business, or property suffered by persons who are U.S. nationals as a result of the September 11th attacks for which they seek recovery under the ATA.

313.    As set forth above, defendants Al Rajhi Bank, NCB, and SBG knowingly provided material support, resources, and substantial assistance to, and conspired with, al Qaeda over many years, with an awareness and intent to further al Qaeda's campaign to carry out terrorist attacks against the United States and its citizens on September 11, 2001.

314.    Through the tortious acts in support of al Qaeda described above, defendants Al Rajhi Bank, NCB, and SBG aided and abetted, and conspired with, al Qaeda to carry out acts of international terrorism against the United States and its citizens on September 11, 2001, in violation of 18 U.S.C. § 2333(d).

315.     At the time of the September 11th attacks, al Qaeda was a designated foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189).

316.     The funding and other material support defendants Al Rajhi Bank, NCB, and SBG provided to al Qaeda, as described above, enabled al Qaeda to acquire the global strike capabilities employed on September 11, 2001, and was essential to al Qaeda's ability to carry out the attacks.

317.     During the decade preceding the September 11th attacks, al Qaeda repeatedly made clear, through both declarations and actions, its intent to use funds and resources provided to it to conduct large scale terrorist attacks in order to kill innocent civilians, destroy property on a mass scale, and cause catastrophic economic harm.

318.     The September 11th attacks were a direct and foreseeable result of the material support and sponsorship of al Qaeda by defendants Al Rajhi Bank, NCB, and SBG.

319.     Plaintiffs and/or their insureds suffered injuries to their persons, property or businesses by reason of the September 11th attacks and defendants' tortious acts in support of al Qaeda.

WHEREFORE, plaintiffs demand judgment against the defendants, jointly and severally, for an amount authorized by governing law to be determined at trial, together with treble damages, punitive damages, pre and post-judgment interest, attorney's fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT II

### AIDING AND ABETTING AL QAEDA AND THE SEPTEMBER 11th ATTACKS IN VIOLATION OF 18 U.S.C. § 2332(a); 18 U.S.C. § 2332(b); 18 U.S.C. § 2332(c) AND 18 U.S.C. § 2333

320.     Plaintiffs incorporate all previous allegations by reference.

321.    The relentless campaign by al Qaeda and its materials supporters to carry out terrorist attacks against the United States and its citizens, which culminated in the September 11th Attacks, involved continuous acts of violence and acts dangerous to human life, that violate the criminal laws of the United States, including the prohibitions set forth in 18 U.S.C. § 2332. *See* 18 U.S.C. § 2332(a) (prohibiting through conduct transcending national boundaries: killing or attempting to kill persons within the United States; causing serious bodily injury or attempting to cause serious bodily injury to persons within the United States; destroying or damaging any structure, conveyance, or other real or personal property within the United States; or attempting or conspiring to destroy any or damage any structure conveyance, or other real or personal property within the United States).

322.    The relentless campaign by al Qaeda and its material supporters to carry out terrorist attacks against the United States and its citizens, including the September 11th Attacks, was intended (a) to intimidate or coerce the civilian population of the United States, (b) to influence the policy of the government of the United States by intimidation or coercion, and (c) to affect the conduct of the government of the United States by mass destruction and murder.

323.    The extraordinary material support and resources that defendants Al Rajhi Bank, NCB, and SBG provided to al Qaeda over many years, as described above, substantially assisted al Qaeda in successfully planning, coordinating, and carrying out the September 11th Attacks, and was essential to the success of those Attacks.

324.    Defendants Al Rajhi Bank, NCB, and SBG knew at all times that they were providing material support for al Qaeda's campaign to carry out acts of international terrorism against the United States and its citizens, and were both aware and intended that the resources they provided would substantially assist al Qaeda in that objective.

325.    As set forth more fully above, but for the assistance provided by defendants Al Rajhi Bank, NCB, and SBG, al Qaeda could not have successfully planned, coordinated, and carried out the September 11th Attacks, which were a foreseeable and intended result of their material support and sponsorship of al Qaeda.

326.    By aiding and abetting violations of 18 U.S.C. § 2332 that have caused injuries to plaintiffs' insureds and plaintiffs themselves, defendants Al Rajhi Bank, NCB, and SBG are jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that plaintiffs and/or their insureds have sustained as a result of such injuries.

WHEREFORE, plaintiffs demand judgment against the defendants, jointly and severally, for an amount authorized by governing law to be determined at trial, together with treble damages, punitive damages, pre and post-judgment interest, attorney's fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT III

## CONSPIRING WITH AL QAEDA IN VIOLATION OF 18 U.S.C. §§ 2332(b) and 2333

327.    Plaintiffs incorporate all previous allegations by reference.

328.    Plaintiffs and their insureds suffered injuries to their persons, property or businesses by reason of acts committed by al Qaeda that involved the murder and attempted murder of persons within the United States, and the mass destruction of real and personal property within the United States, in violation of the criminal laws of the United States, including the prohibitions set forth in 18 U.S.C. § 2332.

329.    The relentless campaign by al Qaeda and its material supporters to carry out terrorist attacks against the United States and its citizens, including the September 11th Attacks, was intended (a) to intimidate or coerce the civilian population of the United States, (b) to influence

the policy of the government of the United States by intimidation or coercion, and (c) to affect the conduct of the government of the United States by mass destruction and murder.

330.    Defendants Al Rajhi Bank, NCB, and SBG agreed to combine and conspire with al Qaeda and other persons to act unlawfully, in the manners set forth in this complaint, and committed overt acts in furtherance of the conspiracy.  At all relevant times, defendants Al Rajhi Bank, NCB, and SBG knew of the conspiracy, including in the cases of Al Rajhi Bank and NCB of the roles of the charitable front organizations and their leaders in furtherance of the conspiracy.

331.    The actions of defendants Al Rajhi Bank, NCB, and SBG facilitated and advanced the conspiracy to conduct terrorist attacks against the United States and its citizens.

332.    By conspiring to act with al Qaeda and other components of that terrorist organization's financial, logistical, and operational infrastructures, in furtherance of their campaign to conduct terrorist attacks against the United States and its citizens, in violation of 18 U.S.C. § 2332, defendants Al Rajhi Bank, NCB, and SBG are jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that plaintiffs and/or their insureds have sustained by reason of the September 11th Attacks.

WHEREFORE, plaintiffs demand judgment against the defendants, jointly and severally, for an amount authorized by governing law to be determined at trial, together with treble damages, punitive damages, pre and post-judgment interest, attorney's fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT IV

## PROVISION OF MATERIAL SUPPORT TO TERRORISTS IN VIOLATION OF 18 U.S.C. § 2339A, 18 U.S.C. § 2339B(1), AND 18 U.S.C. § 2333

333.    Plaintiffs incorporate all previous allegations by reference.

334.    As set forth above, defendants Al Rajhi Bank, NCB, and SBG knowingly and/or recklessly provided material support and resources to al Qaeda, with an awareness of and intent to further al Qaeda's campaign to carry out to terrorist attacks against the United States and its citizens.

335.    As set forth above, but for the assistance provided by defendants Al Rajhi Bank, NCB, and SBG, al Qaeda could not have successfully planned, coordinated, and carried out the September 11th Attacks, which were a foreseeable and intended result of their material support and sponsorship of al Qaeda.

336.    By participating in the commission of violations of 18 U.S.C. § 2339A and 18 U.S.C. § 2339B that have caused plaintiffs and their insureds to be injured in their persons, businesses, or property, defendants Al Rajhi Bank, NCB, and SBG are jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that plaintiffs and/or their insureds have sustained as a result of such injuries.

WHEREFORE, plaintiffs demand judgment against the defendants, jointly and severally, for an amount authorized by governing law to be determined at trial, together with treble damages, punitive damages, pre and post-judgment interest, attorney's fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT V

### COMMITTING ACTS OF INTERNATIONAL TERRORISM IN VIOLATION OF 18 U.S.C. § 2339B(2)  AND 18 U.S.C. § 2333

337.    Plaintiffs incorporate all previous allegations by reference.

338.    As set forth above, defendants Al Rajhi Bank and NCB are sophisticated international financial institutions.

339.    By knowingly collecting funds on behalf of, and transferring funds for the benefit of, al Qaeda's charity agents, with an awareness of al Qaeda's interest in those funds, Al Rajhi Bank and NCB have provided material support to a designated Foreign Terrorist Organization under the Anti-Terrorism and Effective Death Penalty Act of 1996 in violation of 18 U.S.C. §§ 2339B(2)(a) and 2339B(2)(b).

340.    As set forth above, defendants Al Rajhi Bank and NCB were aware of the charities' roles as fronts for al Qaeda, or at a minimum recklessly disregarded information that would have caused them to know that those charities were agents of al Qaeda.

341.    In connection with their provision of material support and resources to al Qaeda in violation of 18 U.S.C. §§ 2339B(2)(a) and 2339B(2)(b), defendants Al Rajhi Bank and NCB aided and abetted and conspired with persons who are subject to the jurisdiction of the United States.

342.    As sophisticated international financial institutions, defendants Al Rajhi Bank and NCB were legally obligated to retain possession of, or maintain control over, all funds belonging to or destined to be transferred to agents of al Qaeda, and to report to the Secretary of the Treasury the existence of such funds in accordance with regulations issued by the Secretary. By failing to do so, defendants Al Rajhi Bank and NCB have violated 18 U.S.C. § 2339B(2), and their actions in violation of § 2339B(2) proximately caused injuries to plaintiffs and their insureds.

343.    Accordingly, defendants Al Rajhi Bank and NCB are jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that plaintiffs and/or their insureds have sustained as a result of such injuries.

WHEREFORE, plaintiffs demand judgment against the defendants, jointly and severally, for an amount authorized by governing law to be determined at trial, together with treble damages,

punitive damages, pre and post-judgment interest, attorney's fees, costs of this action and such

other and further relief as the Court may deem appropriate under the circumstances.

## COUNT VI

## FINANCING OF TERRORISM IN VIOLATION
## OF 18 U.S.C. § 2339C and 18 U.S.C. § 2333

344.    Plaintiffs incorporate all previous allegations by reference.

345.    As set forth above, defendants Al Rajhi Bank, NCB, and SBG willfully and

unlawfully provided funding and related services to al Qaeda and its agents, with the knowledge

and intent that such funds be used, in part, to facilitate acts intended to cause death or serious

bodily injury to civilians such as the victims of the September 11th Attacks, who were not taking

part in any armed conflict.

346.    The acts committed by defendants Al Rajhi Bank, NCB, and SBG in providing

funding and related services to al Qaeda and its agents were intended (a) to intimidate or coerce

the civilian population of the United States, (b) to influence the policy of the government of the

United States by intimidation or coercion, and (c) to affect the conduct of the government of the

United States by mass destruction and murder.

347.    As set forth above, but for the assistance provided by defendants Al Rajhi Bank,

NCB, and SBG, al Qaeda could not have successfully planned, coordinated, and carried out the

September 11th Attacks, which were a foreseeable and intended result of their material support

and sponsorship of al Qaeda.

348.    By virtue of their willful violations of 18 U.S.C. § 2339C, which proximately

caused the injuries suffered by plaintiffs and their insured, defendants Al Rajhi Bank, NCB, and

SBG are jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that

plaintiffs and/or their insureds have sustained as a result of such injuries.

WHEREFORE, plaintiffs demand judgment against the defendants, jointly and severally, for an amount authorized by governing law to be determined at trial, together with treble damages, punitive damages, pre and post-judgment interest, attorney's fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT VII

### COMMITTING ACTS OF INTERNATIONAL TERRORISM IN VIOLATION OF 18. U.S.C. § 2333

349.    Plaintiffs incorporate all previous allegations by reference.

350.    The actions of defendants Al Rajhi Bank, NCB, and SBG in providing funding and other forms of material support to al Qaeda and its agents would constitute "a criminal violation if committed within the jurisdiction of the United States or of any State" and "appear to be intended to intimidate or coerce a civilian population ... to influence the policy of a government by intimidation or coercion or to affect the conduct of a government by mass destruction" within the meaning of 18 U.S.C. § 2331.

351.    The actions of defendants Al Rajhi Bank, NCB, and SBG in providing funding and other forms of material support to al Qaeda and its agents, provided substantial assistance to al Qaeda and its agents in planning, coordinating and carrying out the September 11th Attacks in violation of 18 U.S.C. § 2333, and caused injuries to plaintiffs and their insureds.

352.    The actions of defendants Al Rajhi Bank, NCB, and SBG in providing funding and other forms of material support to al Qaeda and its agents were dangerous to human life, by their nature and as evidenced by their consequences.

353.    The actions of defendants Al Rajhi Bank, NCB, and SBG in providing funding and other forms of material support to al Qaeda and its agents either occurred primarily outside the

territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

354.    Accordingly, the actions of defendants Al Rajhi Bank, NCB, and SBG in providing funding and other forms of material support to al Qaeda and its agents constitute acts of international terrorism as defined by 18 U.S.C. §§ 2331 and 2333.

355.    Defendants Al Rajhi Bank, NCB, and SBG knowingly provided substantial assistance to acts of international terrorism and accordingly, their acts constitute aiding and abetting acts of international terrorism.

356.    Defendants Al Rajhi Bank, NCB, and SBG also agreed to combine with other persons to act unlawfully in the manner set forth above and committed overt acts in furtherance of the conspiracy.  At all relevant times, defendants Al Rajhi Bank, NCB, and SBG knew of the conspiracy, including in the cases of Al Rajhi Bank and NCB of the roles of the charitable front organizations and their leaders in furtherance of the conspiracy.

357.    As set forth above, but for the assistance provided by defendants Al Rajhi Bank, NCB, and SBG, al Qaeda could not have successfully planned, coordinated, and carried out the September 11th Attacks, which were a foreseeable and intended result of their material support and sponsorship of al Qaeda.

358.    For the reasons set forth above, defendants Al Rajhi Bank, NCB, and SBG are jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that plaintiffs and/or their insureds have suffered to their persons, businesses or property as a result of the September 11th Attacks.

WHEREFORE, plaintiffs demand judgment against the defendants, jointly and severally, for an amount authorized by governing law to be determined at trial, together with treble damages,

punitive damages, pre and post-judgment interest, attorney's fees, costs of this action and such

other and further relief as the Court may deem appropriate under the circumstances.

## **JURY DEMAND**

    Plaintiffs demand a trial by jury as to all claims so triable.

                        COZEN O'CONNOR

                        Attorneys for Plaintiffs

DATE:  May 19, 2017             BY: /s/ Sean P. Carter, Esq.
                        Sean P. Carter, Esq.
                        Stephen A. Cozen, Esq.
                        Elliott R. Feldman, Esq.
                        J. Scott Tarbutton, Esq.
                        One Liberty Place
                        1650 Market Street, 28th Floor
                        Philadelphia, PA 19103
                        Tel:  (215) 665-2000
                        Fax:  (215) 665-2013